# IN THE SUPREME COURT OF IOWA

No. 10–1742

Filed December 21, 2012

**STATE OF IOWA,**

Appellee,

vs.

**ROBERT ANTHONY HOWARD,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Muscatine County, Mark J. Smith and Marlita A. Greve, Judges.

Defendant appeals his convictions for second-degree sexual abuse and child endangerment, contending his confession was tainted by a promise of leniency. **DECISION OF THE COURT OF APPEALS VACATED, JUDGMENT OF DISTRICT COURT REVERSED, AND CASE REMANDED FOR NEW TRIAL.**

Mark C. Smith, State Appellate Defender, and Dennis D. Hendrickson and Martha J. Lucey, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Linda J. Hines, Assistant Attorney General, and Alan R. Ostergren, County Attorney, for appellee.

**WATERMAN, Justice.**

After the police detective questioning him promised treatment and implied he would go free if he completed treatment, defendant, Robert Howard, confessed to sexually abusing his girlfriend's son. Howard contends his confession is inadmissible under our caselaw prohibiting the use of confessions obtained following a promise of leniency. The district court denied Howard's motion to suppress his confession, and the jury that heard his confession convicted him of second-degree sexual abuse and child endangerment. A divided court of appeals affirmed his convictions and twenty-five-year sentence. We granted Howard's application for further review.

For the reasons explained below, we conclude the detective's questioning crossed the line into an improper promise of leniency under our long-standing precedents, rendering Howard's subsequent confession inadmissible. The exclusionary rule we enforce again today protects the innocent from a police tactic that can induce false confessions. The error in admitting his confession was not harmless. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

## I. Background Facts and Proceedings.

On January 14, 2010, Howard and his girlfriend, Jessica, took her then seventeen-month-old son, A.E., to the doctor's office after discovering blood in his diaper. Dr. Colette Hostetler examined the baby. Howard and Jessica told Dr. Hostetler that they believed A.E.'s injuries may have been caused by a hard stool. During her examination of the infant, Dr. Hostetler observed a laceration near the top of A.E.'s anus, bruising, swelling, and signs that the blood flow to that area had recently increased. As Dr. Hostetler later testified, she determined to a reasonable degree of medical certainty that the cause of the bleeding was blunt penetration trauma to A.E.'s anus. She also determined the injuries occurred within several hours of A.E. being brought to the clinic

and that, "[b]ecause of the pattern of bruising, . . . [the penetrating object] was bigger than a pencil or a finger but small enough to fit in that area."

In reaching her conclusions regarding the cause of the injuries, Dr. Hostetler specifically rejected the claim that the injuries were caused by a hard bowel movement

> [b]ecause of the pattern of the injury being mostly external to the anal canal, where stools cause an injury that is in the anus or just a little ways beyond that. And the bruising that was present was indicating that there was a blunt force externally.

Dr. Hostetler also noted that bleeding caused by a hard bowel movement is more common with adults than children.

Howard and Jessica had been in a relationship for approximately six months. Howard was spending three to four nights a week at Jessica's parents' home, where she lived with A.E. He spent January 13 there, the night before they took A.E. to the clinic. On the morning of January 14, Howard went to court for a traffic ticket and then he, Jessica, and A.E. drove to Illinois to deliver some clothes to Howard's cousin. Before returning home, they stopped at a friend's house and picked up some food and soda.

After running these errands, Howard and Jessica returned with A.E. to Jessica's parents' home. No one else was there. The home's power went out while they were there. The fuse box was located in a locked room. Jessica did not have a key for this room, so she called her mother, who was working about five to six minutes away. Jessica decided she would go to get her mother's key. About thirty minutes before leaving, Jessica changed A.E. and saw no blood in his diaper or anything abnormal. She put A.E. down for a nap in his crib in the living room.

Jessica was away from the house for around twenty minutes. After she arrived at her mother's workplace, Jessica stayed for about ten minutes talking with her mother. While there, Jessica received a call from Howard. Howard

told Jessica he had discovered blood in A.E.'s diaper while he was changing him. Jessica returned home to find A.E. lying on his stomach, in his crib, screaming. Howard was lying on the floor.

Jessica checked A.E.'s diaper and found blood in it. Jessica called Howard's mother to ask her what could be the cause of the blood. Howard's mother indicated that the blood may have been caused by a hard stool, but recommended that they contact a doctor. A.E. had not had any bloody stools before this day. Jessica called the clinic where she usually took A.E. and was told to bring him. Before they left the house together to take the baby to the doctor, Howard took a shower and changed his clothes. On the way to the clinic, Howard stopped at a friend's house for a few minutes. Jessica and A.E. stayed in the truck during this stop.

After Dr. Hostetler finished examining A.E., she contacted the Iowa Department of Human Services (IDHS) as a mandatory reporter under Iowa law because she suspected A.E.'s anal penetration injuries were caused by child abuse. Dustin Krueger of the IDHS and Detective Tim Hull of the Muscatine Police Department responded and arrived at the clinic to investigate the report. Detective Hull and Krueger interviewed Jessica and Howard separately. Detective Hull did not read Howard his *Miranda* rights and did not tell Howard he was recording their conversation.

Early in their recorded conversation, Howard told Detective Hull he has a pending charge for assault that resulted from a physical altercation he had with an eighteen-year-old who "told [Howard's] 13-year-old sister to suck his dick." In response, Detective Hull said, "You know, I can see how that would make you angry because if you have sex with a 13-year-old, it's actually a 25-year prison sentence . . . ."

Howard initially told Detective Hull and Krueger that he did not know what caused A.E.'s injuries, but suspected it could have been caused by a hard

stool. According to Howard's initial account, shortly after Jessica left, Howard had checked on A.E. and found he was not sleeping, so he took A.E. out of his crib and let him run around and play with his toys. At some point, Howard noticed that A.E.'s diaper needed to be changed. While he was changing A.E., Howard found blood and a hard stool in his diaper. Howard called Jessica to tell her.

As Detective Hull and Krueger continued their interview, Howard told them he did not see A.E. get hurt, cry, or otherwise suggest that he had been hurt at any time that day or while A.E. was up running around. Howard also confirmed that the only people who had come into contact with A.E. between noon and 3 p.m. were Jessica, a friend, and himself, and the friend was never alone with A.E. After Howard admitted that he and Jessica were the only two people who had been alone with A.E. during that time, the following exchange occurred:

> MR. KRUEGER: Do you think Jessica would do something like this?
>
> [HOWARD]: No. To be honest, Jessica don't even yell at that kid. To be honest, she's one of the most perfect mothers I ever seen.

As the interview continued, Detective Hull began discussing the proper punishment for someone who abuses a child. It is the following exchange that begins what Howard contends became an improper promise of leniency:[1]

> DETECTIVE HULL: So what do you think should happen to somebody if they stuck their finger or stuck some foreign object in some kid's butt?

---

[1]We agree with Howard that this is the point at which Detective Hull began to make impermissible promises of leniency. Accordingly, as we explain below, everything discussed after this point, including his confession, is inadmissible in the prosecution's case-in-chief; however, everything discussed before the line was crossed remains admissible. *See State v. Madsen,* 813 N.W.2d 714, 727 (Iowa 2012) ("These statements were properly admitted into evidence because Madsen made the statements before the detective's promise of leniency.").

[HOWARD]: I think they should be punished.

DETECTIVE HULL: What do you think should be punishment?

[HOWARD]: I don't know. I'm not a cop. I don't know the laws are around here.

DETECTIVE HULL: Well, what do you think?

[HOWARD]: I don't know. I just – I don't think – I don't know.

DETECTIVE HULL: What if some guy had kind of like a sickness and he couldn't control himself and he stuck his penis in a year-and-a-half-year-old's butt? What do you think should happen to him? Do you think he should get the help he needs? You know, because, obviously, he's sick and needs help.

[HOWARD]: He should go to a hospital where they can help him or something. I don't know.

DETECTIVE HULL: Okay. How long should he be in the hospital, just until he gets treated for his sickness?

[HOWARD]: Yeah.

DETECTIVE HULL: Okay. How do we get the help, get you the help you need?

[HOWARD]: You really think I did it?

DETECTIVE HULL: I'm just asking you. Do you need help? Do you think we should help you? There's people out there that can help you.

Howard continued to deny that he had sexually abused A.E.

As Detective Hull continued asking Howard what happened that day, the conversation returned to the "help" that is available for people who sexually abuse children and about Howard's future plans:

DETECTIVE HULL: . . . Well, what do you think should happen to someone who would do something like this to a child?

[HOWARD]: They should go to a hospital and get help.

DETECTIVE HULL: Okay. Because, you know, people can be helped that have these types of problems. And they can grow up or get older and, you know, get away from these urges and be a regular person.

. . . .

[HOWARD]: What happens to people like that, though? I've never met someone like that, whatever it is, like with little kids or anything.

DETECTIVE HULL: There's doctors and nurses that treat them and just like any other sickness.

[HOWARD]: I know. But, like, where do they go? Do you know what I'm trying to say?

DETECTIVE HULL: To a treatment center like people go to treatment centers for drug addictions.

[HOWARD]: Yeah. I've been to New Horizons.

DETECTIVE HULL: It's a treatment center for sex addiction. Their addiction is, you know, with children. You know, a lot of people don't want to talk about that stuff; but it happens. We deal with this a lot. You know, we have dozens of cases like this every year. You know, people go get the treatment they need; and, you know, then they can prove they can be around children again.

They have to pass the program and make sure they're going to be safe around kids, and they graduate. And, you know, then they have to slowly prove they can be around kids without doing harm to them.

. . . .

DETECTIVE HULL: Okay. Do you agree with what happened today that that person just needs some help so they don't do this again, they don't ever harm another child?

[HOWARD]: Yeah.

DETECTIVE HULL: Because, I mean, there is help out there. So what kind of help do you need?

[HOWARD]: Help from there, I guess.

. . . .

DETECTIVE HULL: Okay. And if I'm you – Where would you like to be five years from now?

[HOWARD]: Five years for me?

DETECTIVE HULL: Yeah.

[HOWARD]: Well, five years I wish I could have my school under my belt.

DETECTIVE HULL: Right.

[HOWARD]: And be a nice mechanic and have my own house and have a family.

DETECTIVE HULL: Okay. So you could earn a good living.

[HOWARD]: Yeah.

DETECTIVE HULL: Okay. And little [A.E.] will be running around about that time be six and a half?

[HOWARD]: Have whatever he wants.

DETECTIVE HULL: Maybe you and Jessica could even have another child; and you can be normal, right?

[HOWARD]: Yeah.

DETECTIVE HULL: Okay. So how do we get from here to there?

. . . .

[HOWARD]: Well, I'm looking to go to school. I'm looking for a job, so I am trying.

DETECTIVE HULL: Okay. The first thing is that we get you help, right?

[HOWARD]: Yes.

DETECTIVE HULL: Okay. So are you ready to tell us what happened today or – Because this is the time right now.

I know it's difficult for you, but I know you love [A.E.] and you love Jessica. And she loves you. She told us that, okay? And she does want you to be the father figure that [biological father] isn't, okay? He's not going to be that person. She wants you to be that person. She told us so. Okay?

. . . .

Okay. So what happened with [A.E.] today? Come on, I really do want to help you.

[HOWARD]: Okay. Help me.

DETECTIVE HULL: So how did this happen?

[HOWARD]: Like you guys said.

DETECTIVE HULL: Okay. How is that?

You're just sick, Robert. You need help.

[HOWARD]: I know.

DETECTIVE HULL: Okay. So how do we get you there, from here to there? How do we do it? I mean, do you have urges that you can't control?

[HOWARD]: No. (Crying)

DETECTIVE HULL: No, okay.

[HOWARD]: I don't know what brought it on.

DETECTIVE HULL: Okay. What brought what on?

[HOWARD]: Doing that.

DETECTIVE HULL: Okay. What did you do?

[HOWARD]: (No response).

DETECTIVE HULL: You know that no matter what you tell me today, I'll give you a ride home, drop you off, wherever you want to go as long as we can promise that Jessica and [A.E.] can

[be] safe . . . and you're not going to contact them until we know that Jessica and [A.E.] are going to be safe and you get the help you need, okay.

I'll give you a ride wherever you want to go, okay?  Like I say, you just got to promise that you're not going to have contact with [A.E.] and Jessica for a couple weeks, okay?  So what happened?

[HOWARD]: I put my penis in.

. . . .

DETECTIVE HULL: How long did you do that for?

[HOWARD]: Just a minute.

DETECTIVE HULL: Just a minute?

[HOWARD]: Yeah.  Just until he started crying.

Detective Hull, as he promised, let Howard go home that evening.  On January 20, Howard was charged with second-degree sexual abuse and child endangerment causing bodily injury.  Howard moved to suppress his confession alleging that the state violated *Miranda*[2] and that his confession was involuntary under the totality-of-the-circumstances and evidentiary tests. Howard claimed his confession was involuntary because "[Detective] Hull made promises of 'help' if the Defendant admitted to the crime."  Howard argued these statements amounted to "improper influence, and direct and indirect promises of help and leniency," and that, accordingly, Howard's confession should be suppressed.  The district court denied Howard's motion to suppress, concluding

> statements that an individual needs treatment . . . and a promise to get help for the defendant [do] not constitute a promise of leniency in that Detective Hull never referred to avoiding incarceration, that it would go better for the defendant if he told the truth, or that the statements would have any effect on further criminal prosecution.

At trial, the jury heard testimony from three state witnesses: Jessica, Detective Hull, and Dr. Hostetler.  Howard's recorded confession was played for

---

[2]Howard does not appeal from the district court's ruling on his *Miranda* claim.

the jury.  Howard testified and denied having sexual contact with A.E.  Howard explained that he confessed during the interview with Detective Hull and Krueger because he sought to prevent A.E. from being taken from Jessica.  Howard claimed he believed that if he did not confess A.E. would not be able to go home with Jessica that evening because the cause of A.E.'s injuries would still be unknown.  The prosecutor emphasized Howard's confession in his closing argument, asserting that "it buries him."

The jury found Howard guilty of second-degree sexual abuse and child endangerment causing bodily injury.  The district court denied Howard's motion for a new trial and sentenced him to twenty-five years for the second-degree sexual abuse charge and five years for the child endangerment, with the sentences to run concurrently.

Howard appealed, contending the district court erred in admitting his confession into evidence because Detective Hull's statements about getting Howard help were impermissible promises of leniency.  We transferred the case to the court of appeals.

The appeal was heard by a three-judge panel of the court of appeals, which affirmed his convictions, with one judge dissenting.  The majority concluded that "[a]lthough we are troubled by Officer Hull's several statements about getting Howard 'help' and 'treatment,' no promise of leniency in prosecution or sentencing was made."  The majority emphasized that Detective "Hull did not state or imply 'help' would be in lieu of criminal charges."  The majority, thus, concluded that "[t]he officer never crossed the line to explain 'what advantage is to be gained or is likely from making a confession.' "

The dissent concluded that Howard's confession was inadmissible because "the accused was repeatedly and deliberately presented with the idea that his confession would lead to treatment and not to prosecution."  The dissent further noted that:

Howard confessed as a result of the officer's deliberate ruse which implied that treatment in lieu of incarceration would follow, that Howard would have the ability to make plans for the next five years of his life, that he would be released no matter what he confessed, and that he would be permitted to rejoin the family of the child and the child's mother after a short period of no contact with the mother and child. There is no suggestion in this record that Officer Hull indicated to Howard that treatment would be merely a collateral benefit of incarceration. Rather, Officer Hull's tools of persuasion were calculated fiction—that a confession would result in a ride home, treatment, a short period of no contact with the family, followed by a return to unsupervised interaction with children and completion of his schooling.

We granted Howard's application for further review.

## II. Standard of Review.

Our review of the district court's ruling on promises of leniency under the common law evidentiary test is for corrections of errors at law. *State v. Polk*, 812 N.W.2d 670, 674 (Iowa 2012).

## III. Analysis.

We recently declined the State's invitation to abandon our common law evidentiary rule on promissory leniency in favor of a totality-of-the-circumstances test. *State v. Madsen*, 813 N.W.2d 714, 726 (Iowa 2012). We directed district courts to "first employ the evidentiary test to determine the admissibility of confessions challenged on grounds of a promise of leniency." *Id.* at 726 n.1. We also noted that statements made by the defendant during the interview *before* a promise of leniency are not excluded by the evidentiary rule. *See id.* at 727 ("These statements were properly admitted into evidence because Madsen made the statements before the detective's promise of leniency.").

**A. Promises of Leniency.** In *Madsen*, we noted "[c]ourts and commentators have long recognized promises of leniency can induce false confessions leading to wrongful convictions of the innocent." *Id.* at 725. We reiterated that a "confession can never be received in evidence where the

prisoner has been influenced by any threat or promise." *Id.* at 724 (citation and internal quotation marks omitted). In *State v. Mullin*, we asked: "Were the statements made to the accused strong enough so that it could in reason be determined that the prisoner would lie and say he was guilty when he was not, so as to gain some special favor?" 249 Iowa 10, 16, 85 N.W.2d 598, 601 (1957).

We explained the rationale for the promise-of-leniency doctrine as follows:

> While it is hard to believe that a person would admit false facts showing his guilt without greater assurance than is sometimes held sufficient to make inadmissible alleged confessions, the courts feel compelled to go to the extreme to protect the weak or confused innocent party who may feel his chances of establishing his innocence are too remote to turn down what appears to be an assurance of leniency if he will confess to the crime of which he is accused. It seems more reasonable to assume that before an accused would falsify bad conduct for good conduct, he would demand some fairly specific assurance or promise of leniency, which is the obvious reason for the many decisions that a mere statement by an officer that it would be better or wiser to tell the truth, is not such an assurance or inducement as to make a statement by accused inadmissible. However, when the officer or officers go further and explain just how it will be better or wiser for the accused to speak, these statements may suddenly become more than an admonishment and assume the character of an assurance or promise of special treatment which may well destroy the voluntary nature of the confession in the eyes of the law.

*Id.* at 16, 85 N.W.2d at 601–02.

The test "is whether the language used amounts to an inducement which is likely to cause the subject to make a false confession." *Id.* at 17, 85 N.W.2d at 602. We find it difficult to believe that an innocent man would falsely confess to sodomizing a toddler simply because the interrogating officer promises treatment without explicitly promising no other criminal sanctions would follow. But, in *Mullin*, we also warned, " 'the law cannot measure the force of the influence used or decide upon its effect on the mind of the

prisoner,' and therefore excludes the declaration if *any degree* of influence by force *or other inducement has admittedly been exerted* upon him." *Id.* at 14–15, 85 N.W.2d at 600 (quoting *State v. Thomas*, 193 Iowa 1004, 1016, 188 N.W. 689, 694 (1922)). "The use of a per se exclusionary rule eliminates the need for the court to attempt to read the mind of defendant to determine if his confession, in fact, was induced by or made in reliance upon the promise of leniency." *Madsen,* 813 N.W.2d at 726. And, as we noted in *Polk,* "The rule suppressing confessions tainted by promises of leniency deters police from using a tactic that might induce the innocent to confess falsely." *Polk*, 812 N.W.2d at 674 (citing 2 Wayne R. LaFave, et al., *Criminal Procedure* § 6.2(b), at 612–13 (3d ed. 2007) (noting the "exclusionary rule for confessions . . . is also intended to deter improper police conduct")).

The court of appeals majority relied in part on *State v. Whitsel*, 339 N.W.2d 149 (Iowa 1983), where we stated, "We do not consider either an offer to recommend psychiatric help or an offer to inform the prosecutor of defendant's cooperation to be tantamount to a promise of leniency." *Id.* at 153–54 (collecting cases). *Whitsel* is distinguishable. In that case, after being given a *Miranda* warning at the police station, "Whitsel volunteered information concerning his prior arrest on a sexual abuse charge in New Jersey in which the officers offered psychiatric help in exchange for cooperation with the police.*" Id.* at 153. The Iowa detectives responded by telling Whitsel they would recommend he receive psychiatric treatment. *Id.* Here, Detective Hull, not Howard, initiated the discussion of treatment. Importantly, in *Whitsel,* the Iowa detectives "emphasized" to Whitsel "that they could not make any promises or give any guarantees and would only relate to the county attorney what had been said." *Id.* Whitsel's confession followed that disclaimer. *Id.* By contrast, Detective Hull, did not Mirandize Howard and never told Howard he could not make any promise or guarantee that treatment would be the only

consequence, nor did he tell Howard the county attorney would decide whether to pursue criminal charges carrying prison sentences. On the other hand, Detective Hull did tell Howard early in the interview that sex with a thirteen-year-old carried a twenty-five year sentence.

It is true, as the court of appeals' majority noted, Detective Hull never overtly told Howard he would receive a lighter sentence if he confessed. He never said an inpatient treatment program would be the only consequence. He stated no quid pro quo out loud. But, his line of questioning was misleading by omission. As the court of appeals' well-reasoned dissent aptly observed, "Officer Hull's statements strategically planted in Howard's mind the idea that he would receive treatment, and nothing more, if he confessed." *See State v. McCoy*, 692 N.W.2d 6, 28–29 (Iowa 2005) (holding officer's repeated statement to the defendant that "[i]f [he] didn't pull the trigger, [he] won't be in any trouble" rendered the defendant's confession inadmissible because it "indicates leniency in exchange for defendant's confession"). Detective Hull's repeated references to getting help combined with his overt suggestions that after such treatment Howard could rejoin Jessica and A.E. conveyed the false impression that if Howard admitted to sexually abusing A.E. he merely would be sent to a treatment facility similar to that used to treat drug and alcohol addiction in lieu of further punishment. Significantly, Detective Hull did not counter this false impression with any disclaimer that he could make no promises or that charges would be up to the county attorney. We hold his interrogation crossed the line into an impermissible promise of leniency, rendering the confession that followed inadmissible.

**B. Harmless Error.** The State contends we may affirm Howard's convictions because any error in admitting his confession was harmless in light of other overwhelming evidence establishing his guilt. We conclude that, although other evidence of Howard's guilt was strong, we cannot determine the

erroneous admission of his confession was harmless. Howard's recorded confession was played for the jury, and as the prosecutor argued in his final summation, "it buries him."

" 'Error . . . predicated upon a ruling which admits or excludes evidence' " will not provide a defendant with a basis for relief on appeal, " 'unless a substantial right of the [defendant has been] affected.' " *State v. Parker*, 747 N.W.2d 196, 209 (Iowa 2008) (quoting Iowa R. Evid. 5.103(*a*)). We presume the defendant's rights have been prejudiced unless the State can affirmatively establish otherwise. *Id.* The State overcomes the presumption of prejudice if it can establish that there was overwhelming evidence of the defendant's guilt. *See id.* at 210; *see also State v. Ware*, 205 N.W.2d 700, 705 (Iowa 1973) (applying the overwhelming evidence standard in assessing whether the district court's error in admitting defendant's involuntary confession was harmless error).

Howard does not argue the evidence was insufficient to convict him without the inadmissible confession. Rather, he argues he is entitled to a new trial because the State cannot show the erroneous admission of his confession was harmless error. The remaining evidence against him was largely circumstantial. "Circumstantial evidence is equally probative as direct evidence for the State to use to prove a defendant guilty beyond a reasonable doubt." *State v. Brubaker*, 805 N.W.2d 164, 172 (Iowa 2011).

In contending that allowing the confession into evidence was not harmless error, Howard relies heavily on *State v. Moorehead*, 699 N.W.2d 667 (Iowa 2005). In that case, the defendant was charged with operating while intoxicated. *Moorehead*, 699 N.W.2d at 670. The district court rejected Moorhead's claim that he was denied a right to consult with a family member before submitting to a breath test. *Id.* The test results showed Moorehead's blood alcohol level was .182, over twice the limit for intoxication. *Id.* After the

test, when an officer asked if he was okay, he replied, "I'm drunk as hell." *Id.* The district court in a nonjury trial convicted him, relying on the breath test. *Id.* On appeal, the court of appeals held the breath test was inadmissible but affirmed his conviction on harmless error grounds, relying on his admission that he was drunk as hell, as well as the officer's observation of his erratic driving and poor performance on three field tests for sobriety. *Id.* at 672.

On further review, we reversed the conviction, concluding the breath test was inadmissible. We noted

> the test result played a central role in the district court's decision. Because this matter was tried to the court, we have a written exposition of the fact finder's reasoning in the verdict. Moorehead's high breath test result is the very first fact cited as evidence of guilt. Mindful of a defendant's right to a fair trial and just application of our rules, it cannot be fairly said that the breath test result did not injuriously affect Moorehead's rights. The district court's error in admitting this evidence clearly prejudiced Moorehead. Admission of the breath test result into evidence was therefore not harmless error.

*Id.* at 673 (citation omitted). We further held that Moorehead's statement, "I'm drunk as hell," should also be suppressed, unless it was spontaneous. *Id.* at 675. We declined to decide whether it was spontaneous because the district court had not reached that issue. *Id.* We remanded the case for a new trial. *Id.* Howard asserts that *Moorehead* requires a new trial whenever important evidence was erroneously admitted. Defendant's confession is powerful evidence in a child sex abuse case with a victim too young to talk, just as the breath test result of .182 is powerful proof in an OWI case.

After *Moorehead*, however, we have continued to hold that a conviction may be affirmed when supported by other overwhelming evidence of the defendant's guilt. For example, in *State v. Wells*, the State charged Wells with third-degree sexual abuse. 738 N.W.2d 214, 217 (Iowa 2007). Wells was accused of having sexual contact with a fourteen-year-old girl, L.M. *Id.* at 216. While at the hospital undergoing an examination, L.M. told the nurse

examining her that she had engaged in a consensual sexual relationship with Wells, the latest encounter being earlier that evening. *Id.* The nurse conducted a gynecological examination and collected DNA evidence implicating Wells. *Id.* The nurse testified at trial to what L.M. told her, over Wells's objection. *Id.* at 217. The jury convicted Wells of third-degree sexual abuse. *Id.* On appeal, we did not decide whether the district court erred in admitting the victim's statement through the nurse because "[t]he jury was presented with DNA evidence that overwhelmingly established Wells's guilt." *Id.* at 218. We also noted that, "[b]ecause the admission of the evidence was harmless under the standard applied to the claimed constitutional error, it was also harmless under the standard applied [for nonconstitutional error]." *Id.* at 219;[3] *see also State v. Elliott*, 806 N.W.2d 660, 669 n.1 (Iowa 2011) ("Another way to show the tainted evidence did not affect the jury's verdict is to show other overwhelming evidence of the defendant's guilt, making the prejudicial impact of the tainted evidence insignificant."); *State v. Redmond*, 803 N.W.2d 112, 127 (Iowa 2011)

---

[3]To establish harmless error for a *constitutional* violation, " 'the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " *State v. Walls*, 761 N.W.2d 683, 686 (Iowa 2009) (quoting *State v. Peterson*, 663 N.W.2d 417, 431 (Iowa 2003)). We employ a two-step analysis to determine whether the State has met its burden under the constitutional harmless-error standard. *Id.*

> First, the court asks what evidence the jury actually considered in reaching its verdict. Second, the court weighs the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone. This step requires the court to ask "whether the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence."

*Id.* at 686–87 (citations omitted) (quoting *Peterson*, 663 N.W.2d at 431). This two-step analysis is not required for a nonconstitutional harmless-error review. But even under a constitutional analysis, it is possible for the erroneous admission of a confession to be harmless error on a particular record. *See id.* at 690 (Cady, J., dissenting) ("If the [harmless-error] doctrine is inapplicable to improperly admitted confessions, we would not have applied it in *Hensley* to find the trial court error harmless." (citing *State v. Hensley*, 534 N.W.2d 379, 384 (Iowa 1995))).

("Past cases have held the erroneous admission of the defendant's prior conviction does not violate the defendant's 'substantial right[s]' when overwhelming evidence supports his conviction." (quoting *Parker*, 747 N.W.2d at 209)); *State v. Paredes*, 775 N.W.2d 554, 571 (Iowa 2009) (nonconstitutional harmless-error analysis asks whether defendant has been " 'injuriously affected by the error or . . . has suffered a miscarriage of justice' " (quoting *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004)))).

Ordinarily, the erroneous admission into evidence of defendant's confession to the unwitnessed sexual assault of a toddler would require a new trial in the absence of DNA evidence, reliable eyewitness testimony, video, or other compelling proof. The jury convicted Howard of two counts: sexual abuse in the second degree and child endangerment. We consider whether the court's admission of Howard's confession was harmless for each count separately. We consider only the admissible evidence presented at trial including the recorded statements Howard made to Detective Hull and Krueger before any impermissible promise of leniency. *See Madsen*, 813 N.W.2d at 728 (noting that certain "statements were properly admitted into evidence because [the defendant] made the statements before the detective's promise of leniency").

1. *Count I: sexual abuse in the second degree.* The State charged Howard with second-degree sexual abuse in violation of Iowa Code section 709.3(2) (2009). Jury instruction No. 19 required the jury to find:

> 1. On or about January 14, 2010, the defendant performed a sex act with A.E.
> 2. The defendant performed the sex act while A.E. was under the age of 12 years.

Iowa Code section 702.17 defines "sex act," in part, as "any sexual contact between two or more persons by: penetration of the penis into the vagina or

anus."[4]  The jury instructions permitted the jury to consider the type of contact and the circumstances surrounding it in determining whether the contact was sexual in nature.  *See Madsen*, 813 N.W.2d at 728 ("[W]hether a 'sex act' has occurred is a fact question for the jury that can 'be determined from the type of contact and circumstances surrounding it.' " (quoting *State v. Pearson*, 514 N.W.2d 452, 455–56 (Iowa 1994))).

> Such circumstances certainly include whether the contact was made to arouse or satisfy the sexual desires of the defendant or the victim.  However, the lack of such motivation would not preclude a finding of sexual abuse where the context in which the contact occurred showed the sexual nature of the contact.  Other relevant circumstances include but are not limited to the relationship between the defendant and the victim; whether anyone else was present; the length of the contact; the purposefulness of the contact; whether there was a legitimate, nonsexual purpose for the contact; where and when the contact took place; and the conduct of the defendant and victim before and after the contact.

*Pearson*, 514 N.W.2d at 455 (noting with regard to *State v. Phipps*, 442 N.W.2d 611, 612 (Iowa Ct. App. 1989), that "the fact that no nonsexual purpose for the contact was discernible also demonstrated the sexual nature of the contact"). We need to decide whether overwhelming admissible evidence supports the jury's verdict on this count.

A.E., who was then a seventeen-month-old, suffered an injury to his anus, which Dr. Hostetler testified, to a reasonable degree of medical certainty, was caused by an object penetrating the anus that "was bigger than a pencil or a finger but small enough to fit in that area." Dr. Hostetler also testified that A.E.'s injuries were not consistent with that caused by a hard stool because the injuries were predominantly external, whereas she would expect injuries resulting from a hard stool to be primarily internal.  Dr. Hostetler also testified

---

[4]The definition of "sex act" also includes "sexual contact between two or more persons by . . . use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus;" however, the jury instructions omitted this facet of the statutory definition.

that the injuries had occurred within several hours of the time when A.E. was brought to the clinic.

Howard confirmed during the admissible part of his recorded interview that the only people with A.E. during that time were Jessica, Howard, and a friend of Howard's, who Howard said was never alone with A.E. Howard told Detective Hull he never saw A.E. get hurt, cry, or otherwise suggest that he had been injured throughout the day. Howard also told Detective Hull that he did not think Jessica would hurt her child.

Aside from Jessica, Howard was the only one who spent any time alone with A.E. during that time period. Just thirty minutes before Jessica left A.E. alone with Howard while she retrieved her mother's key, she changed A.E. and saw no blood in A.E.'s diaper or any other abnormality. Howard confirmed in the admissible part of his interview that Jessica changed A.E. at that time. Thus, the blood first appeared in A.E.'s diaper while Howard was alone with A.E. during that twenty-minute period while Jessica was away. Howard's claim that A.E.'s injuries resulted from a hard stool was rebutted by Dr. Hostetler's testimony. It is difficult to imagine how a child of A.E.'s age could accidentally suffer an anal penetration injury while wearing a diaper.

Not only was no other accidental or nonsexual explanation for A.E.'s injuries offered, Howard's contemporaneous behavior supports the conclusion that the contact was sexual. When Jessica returned home, A.E. was in his crib, on his stomach, screaming. Howard was lying on the floor. After Jessica spoke with the clinic and they told her to bring A.E. in to be examined, Howard insisted on first taking a shower and changing his clothes. Then, Howard, freshly showered and in clean clothing, further delayed bringing A.E. to the clinic when he stopped at a friend's house on the way to the clinic. These actions show Howard's consciousness of guilt and intent to eliminate any

evidence on his body or on his underwear. This evidence clearly is sufficient to sustain a conviction.

Nevertheless, there was no DNA evidence, video, or eyewitness testimony proving Howard's sexual assault on A.E. The victim is too young to identify his assailant. Two other adults had been with A.E. in the hours before the blood was discovered in his diaper. Howard's statement that Jessica is a "good mother" who would not hurt her child does not conclusively rule her out as a suspect. It is not uncommon for joint caregivers who are romantically involved to cover for each other in the face of allegations of child abuse. *See Paredes,* 775 N.W.2d at 571 (erroneous exclusion of self-incriminating statement by mother not harmless in father's trial for shaken baby syndrome injuries because both parents were suspects, despite father's own confession). To apply the harmless-error rule here would undermine the deterrent value of the exclusionary rule for confessions tainted by a promise of leniency. *See Polk,* 812 N.W.2d at 674 (noting exclusionary rule "deters police from using a tactic that might induce the innocent to confess falsely").

We hold the State has failed to establish Howard was not prejudiced by the erroneous admission of his confession. Accordingly, the error was not harmless, and Howard is entitled to a new trial on the charge of second-degree sexual abuse.

2. *Count II: child endangerment.* The State also charged Howard with child endangerment in violation of Iowa Code sections 726.6(1)(*a*), (*b*) and 726.6(6), alleging that while Howard had custody or control over A.E., he acted in a manner that created a substantial risk to A.E.'s physical health and safety and that he intentionally used unreasonable force against A.E. causing bodily injury. Jury instruction No. 22 required the jury to find:

> 1. On or about the 14th day of January, 2010, the defendant was the person having custody or control of A.E.

2. A.E. was under the age of fourteen years.

3. The defendant committed an act or a series of acts that resulted in physical injury to A.E.

4. The defendant's act resulted in bodily injury to A.E.

The jury instructions defined "bodily injury" as "physical pain, illness or any impairment of physical condition."

The admissible evidence of Howard's guilt is strong, as reviewed above, and is clearly sufficient to sustain a conviction on this count as well. Howard admitted before the promise of leniency that he had been alone with A.E. that day. A.E. was under the age of fourteen. Dr. Hostetler testified A.E. suffered a penetration injury to his anus within several hours of being brought to the clinic. Dr. Hostetler specifically rejected Howard's contention that a hard stool caused A.E.'s injuries because they were not consistent with the trauma that would result from a hard stool. Her medical testimony was unrebutted. Nevertheless, on this record, we cannot say with the required confidence that the introduction of Howard's confession was harmless.

We conclude the State has failed to establish Howard was not prejudiced by the erroneous admission of his confession. Accordingly, the error was not harmless, and Howard is entitled to a new trial on the charge of child endangerment.

**IV. Conclusion.**

For these reasons, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial on both counts.

**DECISION OF THE COURT OF APPEALS VACATED, JUDGMENT OF DISTRICT COURT REVERSED, AND CASE REMANDED FOR NEW TRIAL.**