# IN THE COURT OF APPEALS OF IOWA

No. 23-1441
Filed August 20, 2025

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**COBY DUANE HEMPHILL,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.


　　　　The defendant challenges the denial of his motion for new trial after the jury received unadmitted evidence to consider as part of its deliberation.  **AFFIRMED.**


　　　　Martha J. Lucey, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

　　　　Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.


　　　　Considered without oral argument by Tabor, C.J., Badding, J., and Potterfield, S.J.*

　　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**POTTERFIELD, Senior Judge.**

A jury found Coby Hemphill guilty of sexual abuse in the third degree (count III) and sexual exploitation of a minor (count IV); both crimes involved fifteen-year-old A.R.[1] Weeks later, the court learned that unadmitted evidence had been inadvertently sent back to the jury for its deliberation—eleven pages of screenshots purportedly showing messages sent by Hemphill that were never offered by the State but remained on a flash drive that held some of the State's admitted exhibits. Hemphill moved for new trial on the basis that the jury "received any evidence, paper or document out of court not authorized by the court," which he asserted violated his constitutional right to a fair trial, among others. Iowa R. Crim. P. 2.24(2)(b)(2) (2023). The district court denied the motion for new trial, which Hemphill challenges on appeal.

**I. Background Facts and Proceedings.**

The State charged Hemphill with three counts of third-degree sexual abuse based on allegations that in March 2022, when he was twenty-seven years old, he committed several sex acts against fifteen-year-old A.R.—one by force or against her will and two others while he was four or more years older than A.R. Hemphill

---

[1] Hemphill was charged with three counts of third-degree sexual abuse (counts I, II, and III) and one count of exploitation of a minor (count IV). Count I involved committing a sex act by force or against A.R.'s will, count II was alleged to involve a sex act while Hemphill was four or more years older than A.R. that took place on March 10, 2022, and count III was alleged to involve a sex act while Hemphill was four or more years older than A.R. that took place on March 13, 2022.

The State dismissed count I during trial, and the jury acquitted Hemphill of count II. The jury found Hemphill guilty of committing a sex act against A.R. on March 13, 2022 (count III) and possessing a visual depiction of A.R. engaged in a prohibited sex act (count IV).

was also charged with sexual exploitation of a minor based on the allegation that he possessed a photo of A.R. engaged in a prohibited sexual act.

Hemphill maintained his innocence, and the case was tried to a jury. A.R. testified, detailing events that took place over her spring break during her freshman year of high school. She reported that Hemphill picked her up from her father's house on at least two separate dates—March 10 and March 13, 2022. From there, he took her to his home nearby and perpetrated sex acts against her. The State introduced footage from a surveillance camera showing outside the father's house, which showed a vehicle that looked like Hemphill's both picking A.R. up and later dropping her off on March 13. The State also introduced exhibits showing written messages sent back and forth between A.R. and Hemphill, in which Hemphill called A.R. "baby," told her she was "hot" and that he loved her, and described sex acts he wanted to perform, including stating, "I'll be seeing them when I'm down there with my tongue inside you" and "I want to make love tomorrow not fuck lol it's like more passionate lol."

A.R.'s mother, Margaret, testified she became concerned on March 13 when she realized A.R. had turned off the location of her cell phone. Margaret video called A.R to see where she was. According to A.R., the call interrupted Hemphill having vaginal intercourse with her, which stopped the sex act before he ejaculated. Later testing of the underwear A.R. was wearing on March 13 found seminal fluid but no sperm—the criminalist who performed the test explained this result could occur because it was pre-ejaculate in the underwear.

On March 14, after some questioning from Margaret, A.R. told her about the sex acts. Margaret made a report to the police; she provided A.R.'s cell phone to law enforcement.

When the police contacted Hemphill, he denied that he had met A.R. in person though he admitted they communicated via a social media app. After the officer obtained a warrant, he called Hemphill again, asking him to come down to the station to give his DNA. Hemphill did not show up when he said he would, and when the officer called the same phone number again, the person who answered said it was no longer Hemphill's phone number. A few days later, the officer went to Hemphill's home to obtain his DNA. When the officer asked Hemphill to turn over his phone, Hemphill initially denied having one even though the officer could see it in Hemphill's pocket. Later extraction of the phone's data showed Hemphill searched for information on how to "pull records of your past few months of texting from your phone after they've been del[eted]" and "alter my dna [if] the cop has to do a cotton swab." The extraction also recovered data showing Hemphill saved a photo of bare breasts to his phone in February 2022; A.R. later identified the photo as one she took of herself and sent to Hemphill.

At trial, Hemphill admitted that he sent messages to A.R. and had met her in person; he generally denied any sex acts occurred. Hemphill's wife testified she was with him from approximately 2:30 p.m. to 11:00 p.m. on March 10; they traveled out of town for new tattoos. The couple's roommate testified he was home on March 10 and Hemphill never brought a teenaged girl to the home. And Hemphill's mother testified he was with her on March 13 from about 4:00 p.m. until 11:00 p.m. except for a short window when he went to a store to buy her paint; she

spoke with him on the phone while he was at the store regarding the paint she wanted.

The State dismissed count I during trial, and the jury acquitted Hemphill of count II. The jury found him guilty of committing third-degree sexual abuse on March 13 (count III) and of sexual exploitation of a minor (count IV).

Weeks later, the court learned that unadmitted evidence had been inadvertently sent back to the jury for its deliberation.[2] Some of the State's evidence was held on a flash drive, and that flash drive was provided to the jury. Also included on the flash drive was a PDF named "Exhibit 26 Screenshots of messages from the defendant," which consisted of eleven pages of screenshots that showed various messages purportedly sent by Coby.[3] Generally speaking, the messages contained denials that any sex acts took place and requests to not get law enforcement involved. The messages also denied that A.R. had been to his home or that he ever picked her up in his vehicle. The State never sought to introduce the PDF at trial.

The court notified both parties of the issue, and the State was allowed to examine the flash drive to see if it could determine whether the jury actually reviewed the non-evidence.

---

[2] A court reporter noticed the problem when working on an exhibit maintenance order and alerted the judge who presided over the trial.

[3] Two pages show messages that appear to come from the account of Hemphill's wife; during her trial testimony, she denied sending any messages. And the State's name of the document attributes the messages to Hemphill.

While the content of one message suggests it was sent to A.R. and the content of others suggest they were intended for A.R.'s parents, it is not clear from the screenshots themselves who received the messages.

In the meantime, Hemphill moved for new trial pursuant to Iowa Rule of Criminal Procedure 2.24(2)(b)(2), which allows the court to grant a new trial "[w]hen the jury has received any evidence, paper or document out of court not authorized by the court." He also argued he was deprived "of his constitutional rights to due process, a fair trial by an impartial jury, effective assistance of counsel, and confront witnesses and evidence against him."

The court allowed the State to present evidence from an IT professional about the flash drive and heard Hemphill's motion for new trial. After hearing the testimony, the court concluded it was not possible to determine whether the jury accessed the PDF, so it would presume the jury did when deciding the appropriate remedy.[4] The State and Hemphill disagreed on what test the court should apply: they contested who had the burden, whether there was a presumption of prejudice, and more. But both parties agreed that there was not intentional misconduct; the PDF was accidentally provided to the jury.

In evaluating Hemphill's motion, the district court concluded he was not automatically entitled to a new trial due to the jury reviewing unadmitted evidence, noting that prejudice is necessary even in cases involving intentional misconduct. But the court concluded it would presume prejudice to Hemphill since that is the

---

[4] The State argued the jury had not opened the PDF, pointing out that the document showed it was "[a]ccessed" on April 12, which was a day before the jury was given the flash drive. But it was apparent the court reporter who alerted the judge of the issue had been able to determine the contents of the PDF, and that took place weeks after April 12. So either the "accessed" date was not reliably showing the last time the PDF was opened or—as the IT professional testified was possible—the court reporter was able to see and read at least part of the document without ever opening it (due to a "preview" function). If the court reporter could determine the contents without accessing the document, then it was possible the jury did as well.

standard used when the jury is allowed to consider improper evidence (as in cases where the court wrongly overrules an evidentiary objection). And, finally, the court concluded that the presumption of prejudice was overcome because the properly admitted evidence of Hemphill's guilt as to counts III and IV was overwhelming while the wrongly available non-evidence was cumulative of properly admitted evidence—both Margaret and a police officer testified that Hemphill denied engaging in physical acts with A.R. but admitted sending her messages over social media.

Hemphill moved to reconsider, arguing the court wrongly used the harmless error standard for a nonconstitutional error. He maintained the jury's exposure to extraneous evidence was a violation of his constitutional rights so the court should have analyzed his claim under a constitutional harmless error standard instead.[5]

---

[5] *Contrast State v. Sullivan*, 679 N.W.2d 19, 29–30 (Iowa 2004) ("Where a nonconstitutional error was claimed, the test for determining whether the evidence was prejudicial and therefore required reversal was this: 'Does it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice?' . . . [I]n a harmless error analysis where a nonconstitutional error is claimed . . . we presume prejudice—that is, a substantial right of the defendant is affected—and *reverse* unless the record affirmatively establishes otherwise." (citation omitted)), *with State v. Howard*, 825 N.W.2d 32, 43 n.3 (Iowa 2012) ("To establish harmless error for a *constitutional* violation, the State must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We employ a two-step analysis to determine whether the State has met its burden under the constitutional harmless-error standard. First, the court asks what evidence the jury actually considered in reaching its verdict. Second, the court weighs the probative force of that evidence against the probative force of the erroneously admitted evidence standing alone. This step requires the court to ask whether the force of the evidence is so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same without the erroneously admitted evidence." (cleaned up)).

The State filed a response, agreeing with Hemphill that the court should apply the constitutional harmless error standard.

After an additional hearing, the district court filed an amended and substituted order again denying Hemphill's motion for new trial. The court concluded because the non-admitted screenshots contained denials by Hemphill, which generally aligned with his trial strategy, and the evidence supporting his guilt on counts III and IV was overwhelming, the State proved beyond a reasonable doubt that the verdicts rendered would have been the same without the jury receiving the screenshots.

Hemphill appeals.

## II. Discussion.

On appeal, Hemphill argues the district court abused its discretion in denying his motion for new trial. *See State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) ("We review a trial court's ruling on a motion for new trial for an abuse of discretion."). He relies on the same cases and tests as he argued to the district court—he maintains prejudice should be presumed and that the State has the burden to prove beyond a reasonable doubt that the jury's verdicts were not influenced by the screenshots.

The State asks us to affirm the denial of the motion for new trial; it maintains the district court got the right result while pointing us to a different test that we should apply—the jury misconduct test. In *State v. Proctor*, 585 N.W.2d 841, 845 (Iowa 1998), "[t]he State had successfully moved in limine to block [the defendant's] proffer of an offender 'profile' prepared by state agents during the murder investigation. . . . Subsequently, the document was included by mistake

among the exhibits given to the jury." The defendant moved for new trial on the basis that the jury "received any evidence, paper or document out of court not authorized by the court." *Proctor*, 585 N.W.2d at 845; Iowa R. Crim. P. 2.24(2)(b)(2). The district court denied the motion for new trial, which our supreme court reviewed on appeal. *Proctor*, 585 N.W.2d at 845. The supreme court recognized that trial courts have broad discretion when ruling on the motion for new trial and applied the following test, "Based on objective facts elicited from the jurors concerning the alleged misconduct, the court may grant a new trial if (1) the acts or statements complained of exceed tolerable bounds of jury deliberation, and (2) the misconduct was calculated to, and with reasonable probability did, influence the verdict." *Id.* The State asks us to do the same here.

In his reply brief, Hemphill argues, "This case does not involve jury misconduct since the jury did not gather its own evidence. As such, the jury misconduct standard does not apply." But, importantly, *Proctor* also did not involve jury misconduct. There, just like here, an unadmitted piece of evidence was inadvertently given to the jury. *See id.* Because the situations are alike, the same test applies—regardless of the misnomer. *See id*; *see also State v. Holland*, 485 N.W.2d 652, 653, 655 (Iowa 1992) (applying the same test when the jury, "through no fault of its own," inadvertently saw the defendant's work release card during its deliberations).

"First, the evidence bearing on misconduct must be based only on objective facts as to what occurred." *State v. Christensen*, 929 N.W.2d 646, 664 (Iowa 2019). In other words, "juror statements about the impact of the improperly introduced influence are not admissible on the question of prejudice." *Id.* at 679.

"What can be considered is objective facts—who said what to whom and when and what specifically was injected into the jury discussion. But juror assessments about the impact of the improper extraneous influence are off limits." *Id.* In Hemphill's case, the jurors were not asked if they reviewed the screenshots or what impact the unadmitted evidence had on their discussion. After the State was unable to establish that the screenshots were not reviewed, the district court decided to assume the jurors reviewed the unadmitted evidence. We will do the same.

Next, we ask whether "the acts or statements complained of exceed tolerable bounds of jury deliberation." *Proctor*, 585 N.W.2d at 845. While jurors have considerable latitude in their deliberations, "introduction of additional, outside information is beyond permissible bounds." *State v. Johnson*, 445 N.W.2d 337, 342 (Iowa 1989), *overruled in part on other grounds by State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016). "[O]utside information relayed to the jury before or during jury deliberations exceeds the permissive bounds of jury deliberation." *Christensen*, 929 N.W.2d at 665. Giving the jury access to the unadmitted screenshots exceeded the tolerable bounds of deliberation.

The final question is whether "the misconduct was calculated to, and with reasonable probability did, influence the verdict." *Proctor*, 585 N.W.2d at 845. In *Proctor*, the supreme court focused on whether there was a reasonable probability the outside information influenced the verdict—ignoring the question of whether anyone intended to influence the verdict, presumably because the extraneous information was accidently shared with the jury. *See id.*; *see also Holland*, 485 N.W.2d at 655 (providing the test without the "calculated to" component). We take

the same approach. As previously stated, the screenshots were of messages in which someone—it appears Hemphill—denied that he ever committed any sex acts against A.R. while admitting they exchanged messages on social media. On their own, we do not think his denials of criminal acts are the type of evidence that is reasonably likely to influence a jury to find a person guilty. And here, the content of the messages did not contradict or otherwise weaken the evidence Hemphill did present at trial. In fact, they aligned with his general trial strategy. The district court concluded that the verdicts on count III and IV would have been the same without the unadmitted screenshots. We agree—there is not a reasonable probability that the unadmitted screenshots influenced the jury's guilty verdicts.

While we apply a different test than the district court, we affirm the denial of Hemphill's motion for new trial.

**AFFIRMED.**