**IN THE COURT OF APPEALS OF IOWA**

No. 13-1998
Filed June 10, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DEANNA MARIE HOOD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Arthur E. Gamble,

Judge.


        Deanna Hood appeals from her convictions and sentences for murder in

the first degree and robbery in the first degree.  **AFFIRMED.**


        Susan R. Stockdale, Windsor Heights, for appellant.

        Thomas J. Miller, Attorney General, Alexandra Link, Assistant Attorney

General, John P. Sarcone, County Attorney, and Daniel Voogt and Stephanie

Cox, Assistant County Attorneys, for appellee.


        Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**VOGEL, P.J.**

Deanna Hood appeals from her convictions for murder in the first degree and robbery in the first degree.[1]  She asserts several claims on appeal: (1) substantial evidence does not support either conviction; (2) the district court erred when it denied her motion for new trial; (3) the court improperly admitted evidence of drugs found in both her residence and the vehicle used at the crime scene; and (4) the court erred as a matter of law when it found her race-neutral explanation for striking an African-American juror not credible and granted her co-defendant's reverse-*Batson* challenge.

We conclude substantial evidence supports the guilty verdicts. Furthermore, the district court employed the correct legal standard when considering Hood's motion for new trial, and properly found the weight of the evidence supported the guilty verdicts.  The court also properly admitted into evidence the drugs found in the vehicle and Hood's residence pursuant to Iowa Rule of Evidence 5.404(b).  With respect to the reverse-*Batson* challenge, given credibility determinations are within the province of the district court, it properly granted the motion.  Consequently, we affirm Hood's convictions.

**I. Factual and Procedural Background**

From the evidence admitted at trial, the jury could have found the following facts.  The victim—Steven Harmon—and Hood previously had a romantic relationship and remained acquainted after the relationship ended.  Hood and her

---

[1] Her codefendant, Spencer Pierce, appeals separately.  *See State v. Pierce*, No. 13-2004, 2015 WL _____ (Iowa Ct. App. __ __, 2015).

co-defendant, Spencer Pierce, were in an intimate relationship at the time of the murder and shared an apartment.

On several occasions in the beginning of June 2013, Michelle Sanders and her boyfriend, Tracy Stone, went to Harmon's apartment in Des Moines to buy methamphetamine. On these occasions, Sanders would give Harmon the money, and Harmon would leave the apartment for ten to fifteen minutes before returning with the drugs. On June 5, 2013, Sanders arranged with Harmon to purchase one ounce of methamphetamine for $1700. Sanders and Stone went to Harmon's apartment around 6:00 p.m. After Sanders gave Harmon the cash, Harmon stated he was waiting for a phone call. Both Sanders and Stone remained in Harmon's apartment for several hours, smoking methamphetamine.

Hood and Pierce were also at Harmon's apartment on June 5. Hood and Harmon had a private conversation in the bathroom. Sanders overheard them saying "she" and "she has," leading her to believe they were talking about the money she brought to buy drugs. It was her understanding that Hood supplied the methamphetamine and Harmon was attempting to facilitate the purchase. Hood and Pierce then left but returned a few minutes later. The two left a second time, after which Harmon's cat disappeared.[2] Harmon called Hood, who admitted she took the cat. Stone testified he saw Hood and Pierce leave in a gold Dodge Durango.

After waiting several hours without being able to purchase any methamphetamine, Sanders and Stone left Harmon's apartment around 11:00 p.m. A short time later, Harmon called and told them to come back because he

---

[2] The cat was later found in Hood's residence upon the execution of the search warrant.

was able to acquire the drugs. Harmon told Sanders the methamphetamine was not coming from Hood, and Stone understood it was Pierce who would supply the drugs they were going to purchase. Sanders gave Harmon $1700 to buy the methamphetamine. By that time, Kimberly Frye—who had been staying in Harmon's apartment for several days and was Harmon's paramour—had arrived. Harmon left the apartment with Sanders's $1700, and Frye accompanied him. Sanders and Stone stayed in the apartment waiting for Harmon to return with the methamphetamine.

Frye rode with Harmon as he drove to an industrial area where many semi-trailers were parked. Harmon was in the process of moving out of his apartment, and he stored property in a trailer parked at a business called Bindery 1. Harmon's trailer also had a small living area with a couch and a refrigerator. When they arrived around 11:30 p.m., Harmon sorted through belongings in the front of the trailer while Frye smoked a cigarette on the couch in the rear. Harmon walked back to the couch as he was speaking on the phone and seemed upset. Frye could hear a female voice on the other end of the line. Harmon said: "I'm not going to the f***ing hood," and told the caller he was at the trailer before hanging up.

Harmon also sent a number of text messages from his phone, after which he walked outside to his pickup truck. Soon after Harmon left the trailer, Frye heard a vehicle pull up that she assumed was there to complete the drug deal. She heard what she believed was a middle-aged, African-American male's voice

say: "Give me your stash." [3]  Harmon responded: "Go ahead.  Take it.  Calm down."  Next, Frye heard two gunshots followed by car doors slamming and the vehicle driving away.  She stated the transaction lasted no longer than two or three minutes.

Fearing for her own safety, Frye hid in the trailer for approximately twenty minutes.  She then left the trailer, found Harmon's body lying on the ground, and yelled his name.  Because she did not have a cell phone, she walked across the lot to a motor home inhabited by Robert Rokitnicki to call 911.  They used Rokitnicki's phone to place the call, but Rokitnicki provided the wrong address.  Rokitnicki then agreed to drive Frye to a gas station/convenience store, where she called 911.

Meanwhile, Sanders and Stone were still at Harmon's apartment waiting for him to return with the drugs.  However, they grew impatient when Harmon stopped responding to either Sanders's text messages or phone call.  They decided to leave when they heard Harmon's name and other identifying information broadcast over the police scanner.

Officer Phillip Terrones responded to the 911 call and found Frye at the gas station.  Frye led the police to Bindery 1, where they found Harmon's body lying face down between two trailers.  Patrol officers secured the scene and summoned detectives and crime scene investigators.  They recovered a spent

---

[3] Pierce is African-American, Hood is Caucasian.

twelve-gauge shotgun shell and a shot cup near Harmon's body.[4]  They also found a cooling tube that had fallen off a shotgun.  Investigators further identified a damaged spot on the trailer near Harmon's body that indicated two shots had been fired—one that hit the trailer and a second that struck Harmon.  The murder weapon was never recovered.  Police found no money in Harmon's possession, and the $1700 was never recovered.  Additionally, police never found Harmon's cell phone, even after attempting to locate it by sending an "emergency ping."

Later that morning, Bindery 1 employee Jason Bolen went to the business after seeing news coverage of the murder.  Bolen helped Detective Lorna Garcia retrieve surveillance videos from the two DVR systems that monitor twenty-four cameras around the property.[5]  The videos showed that Harmon's truck arrived and parked next to his trailer at 11:46 p.m.  After Harmon's truck, the only other vehicle was an SUV that arrived at 12:47 a.m. and was on the property for approximately five minutes.  At one point, the SUV stopped by the trailers and two people got out; a short time later, two people got back in the vehicle and drove away at 12:53 a.m.[6]  No other vehicles appeared until the police arrived.  After viewing the video, police determined that the second vehicle was a Dodge Durango.

---

[4] Following an autopsy, it was established Harmon suffered a shotgun wound with gunpowder burns on his back.  The wound was caused by a blast from a twelve-gauge shotgun with a number five birdshot.  The medical examiner determined Harmon was shot from a distance of no greater than one inch because the pellets did not spread and because the plastic shot cup lodged in his body.

[5] The time stamps on the videos were not accurate.  One DVR was twenty-five minutes slow, and the second DVR was ten hours and six minutes ahead of the actual time.  Detective Garcia was the officer who established the actual times.

[6] Specifically, Detective Garcia testified: "[The video] shows two occupants of the SUV leaving, as they arrive, getting out of the vehicle, and a few minutes later you'll actually see two people.  Looks like they're returning to the car because the car leaves shortly after that."

Police also obtained Hood's cell phone records, which disclosed communication between her and Harmon immediately before the estimated time of the murder.[7] Specifically, Hood called Harmon at 7:41 p.m. on June 5, and they exchanged text messages between 8:26 and 9:41 p.m. They had another phone conversation at 10:27 p.m., followed by an exchange of text messages between 10:39 p.m. and 12:06 a.m. Hood also called Harmon at 12:07 a.m., and her phone connected through a cell tower at a downtown location. They continued exchanging text messages. Hood called Harmon again at 12:27 and 12:33 a.m., with her phone connecting through the same cell tower. More text messages were exchanged between 12:47 and 12:49 a.m. At 12:49 a.m., Hood called Harmon for nineteen seconds. Her phone connected through a tower on Northeast Fourteenth Street, four blocks from Bindery 1. Another call at 12:50 a.m. from Hood to Harmon lasted one second, and her phone again connected through the tower four blocks from the murder scene. After the 12:50 a.m. call, Hood's phone was never used again. Additionally, Hood reactivated an old cell phone the day after the murder. Authorities never recovered her deactivated phone.

Authorities further learned that Bree Whipps, who was acquainted with Pierce, saw Hood and Pierce together at a convenience store on East Thirtieth Street sometime between 10:00 p.m. and 2:00 a.m. The store was a short

---

[7] It was explained during the testimony that cell phones work by sending a radio wave to a tower, which connects to a switch in the phone network. The phone then connects to the tower with the strongest signal, which is typically the closest tower to the phone. Although towers have a maximum range of two to ten miles, the distance is usually shorter in urban areas like Des Moines. This evidence came in without objection as to foundation.

walking distance to the apartment building in which Hood and Pierce were living. At one point after Whipps saw them at the convenience store, Pierce drove Whipps to his uncle's house. Whipps testified that Pierce was driving a small red sedan, which was later established to be a red Saturn. Whipps also met Pierce and Hood the next day for breakfast, and they were again driving the red Saturn.

Detective Garcia obtained surveillance videos from the convenience store, which depicted Hood and Pierce entering and leaving a few minutes later. However, the timestamp was inaccurate. At trial, Detective Garcia attempted to establish the actual timeframe in which Hood and Pierce were in the store, but defense counsel objected based on lack of personal knowledge. The district court sustained the objection and the actual times were never entered into evidence.

With regard to Pierce's phone, records established Pierce's last outgoing call on the night of June 5 was at 11:20 p.m. He then received calls at 1:13 a.m. and 1:45 a.m. from Whipps. He also made a call at 3:29 a.m. Police officers determined all the phone calls Pierce made and received on the night in question bounced off the cellular tower closest to his apartment, several miles from the site of the murder.

On June 7, a plain-clothes police officer who had been tasked with finding the Dodge Durango observed Pierce driving it into the apartment complex where he and Hood resided. The officer detained Pierce. Detectives impounded the Durango and secured the apartment so they could obtain a search warrant. Hood was inside the apartment. Upon executing the search warrant, police found a lockbox in the refrigerator that contained drug paraphernalia, packaging,

a digital scale, and several baggies containing marijuana and methamphetamine, the amount of which was consistent with distribution.[8] The apartment also contained letters and paperwork bearing the names of Hood and Pierce.

In August, police searched the impounded Durango. Under the air filter, they found a grocery sack containing six plastic baggies of methamphetamine, totaling 162 grams. Police were also able to identify this vehicle as the same vehicle that was captured on video the night of Harmon's murder. Several fingerprints were lifted from the Durango. Six of those were identifiable but did not match the prints of Hood or Pierce. No other incriminating evidence was found in the Durango.

The Durango was owned by Erlaly Anderson, a friend of Pierce's. Anderson and Corvelle Beeks[9] were in a relationship and lived together in an apartment on Hickman Road. Beeks's phone records indicated he received a call from Anderson at 12:07 a.m. the early morning of June 6, which connected to his cell phone through a tower four blocks from Bindery 1. Beeks's phone was deactivated and a new phone activated on June 6.

Additionally, about one week after impounding the Durango, officers returned to the semi-trailer lot about the same time of night as the shooting. They created a "reenactment" video, driving the Durango on the same path as the vehicle in the surveillance video and comparing the two for similarities. Detective Brad Youngblut, who helped create the reenactment, testified the two

---

[8] Two baggies contained a total of 6.5 grams of marijuana, two additional baggies contained 39.5 grams of marijuana, and eight separate baggies contained a total of 46.6 grams of methamphetamine. Brady Carney, a senior police officer for the City of Des Moines, testified that this amount was consistent with the sale of methamphetamine.
[9] Beeks is also African American.

vehicles were the same. The court admitted the reenactment videos into evidence.

On August 23, 2013, Hood and Pierce were charged with first-degree murder, in violation of Iowa Code sections 707.1 and 707.2 (2013), and first-degree robbery, in violation of Iowa Code sections 711.1 and 711.2, along with a dangerous weapon enhancement under section 902.7. Prior to trial, Pierce and Hood filed a joint motion in limine requesting the drug and distribution evidence found in the apartment and the Durango, as well as the reenactment videos, be excluded;[10] the district court denied the motion. The jointly-held[11] jury trial commenced on October 28, 2013, and on November 6, 2013, the jury returned a verdict of guilty as to both counts for both defendants. Hood was sentenced to a life term of incarceration on December 17, 2013. Hood appeals.

**II. Standard of Review**

When the defendant challenges the sufficiency of the evidence, we look to the record to determine whether substantial evidence supports the verdict. *State v. Button*, 622 N.W.2d 480, 483 (Iowa 2001) (noting: "In deciding whether the evidence is substantial, we view the evidence in the light most favorable to the

---

[10] Though the written motion mentioned only the drug evidence found in the apartment, prior to trial, defense counsel indicated the motion to exclude also encompassed the drugs found in the Dodge Durango. Specifically, he stated:

> I discovered on Friday that some of the evidence the State intends to introduce in this case involves certain narcotics that [were] recovered from a Dodge Durango in August of this year. That is part of a separate narcotics case that is pending against my client, and I would add that evidence in addition to the evidence outlined in item number two [in the filed motion in limine] for the Court to consider and for the Court to forbid the State from entering that evidence in this trial.

[11] Pierce filed a motion to sever prior to voir dire, which the district court denied in a written ruling.

State and make all reasonable inferences that may fairly be drawn from the evidence." (internal citation omitted)).

We review a district court's ruling on a motion for new trial, as well as evidentiary rulings, for an abuse of discretion. *See State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 1998) (noting appellate review is "limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence"); *see also Pexa v. Auto Owners Ins.* Co., 686 N.W.2d 150, 155 (Iowa 2004). Additionally, interpretations of the Iowa Rules of Criminal Procedure are reviewed for correction of errors at law; to the extent we are reviewing constitutional issues, our review is de novo. *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012).

## III. Reverse-*Batson* Challenge

We begin with Hood's assertion the district court erred when it granted Pierce's reverse-*Batson* challenge.[12] She contends she offered a race-neutral explanation for striking the potential juror, and the court erroneously concluded she was engaging in a pattern of striking African-American jurors.

When a defendant uses her peremptory challenges to engage in purposeful race discrimination, and the use of the strike is challenged, it is known as a reverse-*Batson* challenge. *Id.* As the United States Supreme Court has noted:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral

---

[12] No arguments were presented with regard to the issue of Pierce's standing to assert the reverse-*Batson* challenge, as against a codefendant's use of a preemptory strike.

explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767 (1995).

"In determining whether the party objecting to the strike has made a prima facie case of purposeful discrimination, the court may consider all relevant circumstances, including a pattern of strikes against jurors of a particular race." *Mootz*, 808 N.W.2d at 215. Here, Hood struck one of the two or three African-American jurors for cause, then used her first peremptory strike to remove the second African-American juror. We agree with the district court's conclusion that this pattern creates a prima facie case of discrimination. *See State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990).

With regard to the second portion of the *Batson* analysis:

Step two in a *Batson* analysis is extremely deferential to the party seeking to strike the juror. In the Supreme Court's words: "At this step of the inquiry, the issue is the facial validity of the [attorney's] explanation. Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral."

*Mootz*, 808 N.W.2d at 218 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). Hood's counsel offered the following explanation for striking the juror: "My number one choice is sitting in the alternate pool. Otherwise, [the African American juror] wouldn't have been my first strike, but she seemed disinterested to me from the beginning, and race had nothing to do with us exercising a strike on her." This could establish a race-neutral explanation, particularly given the deference afforded to the attorney's reasoning. *See id.*

The third step of the analysis requires the district court to determine "whether the stated reason constitutes a pretext for racial discrimination." *Id.* at 219 (internal citation omitted). The burden of proof rests with the party challenging the strike. *See id.* Credibility determinations regarding the attorney's race-neutral explanation are within the province of the district court. *Id.* at 219–20.

Here, the district court made the following findings:

> I'm going to sustain the *Batson* challenge, and I don't see any race-neutral basis for exercising this preemptory challenge on [the prospective juror], at least not as has been articulated up to this point. There was very little questioning of her during voir dire, and she really disclosed no bias or prejudice one way or the other . . . . [T]he bottom line here is that the Court seeks to be nondiscriminatory in jury selection, and I'm just not hearing a legitimate basis for this strike.
> . . . .
> [T]he prima facie case is that Defendant Spencer Pierce is African-American, the potential juror . . . is African-American, and a preemptory challenge was made.
> Then the Court asked [defense counsel] for a race-neutral reason for the preemptory challenge, and the Court finds it to be unconvincing.

Credibility determinations are within the province of the district court, and we give considerable deference to its findings on appeal. *See id.*; *see also State v. Griffin*, 564 N.W.2d 370, 376 (Iowa 2007) (noting with approval the opinions of appellate courts that gave deference to the district court's credibility determinations within the context of a *Batson* challenge). This concept is particularly pertinent here because the district court is in the unique position of being able to view and interact with defense counsel and the prospective juror. Thus, we give deference to the court's explicit finding that defense counsel's explanation was not credible. *See Griffin*, 564 N.W.2d at 376; *see also State v.*

*Myers*, 382 N.W.2d 91, 97 (Iowa 2014) (noting credibility determinations are within the sole discretion of the fact-finder). Furthermore, given the fact the potential juror was not questioned by Hood's counsel during voir dire, the court's finding is objectively reasonable. Consequently, we conclude the court properly granted Pierce's reverse-*Batson* challenge.

## IV. Drug Evidence

Hood next asserts the district court improperly admitted into evidence the drugs seized from the apartment Hood occupied with Pierce, as well as those seized from the Durango. She argues the methamphetamine found in the Durango was not inexplicably intertwined with the crime, as defined in *State v. Nelson*, 791 N.W.2d 414, 423 (Iowa 2010), and contrary to the district court's conclusion.[13] She further contends the drugs found in the apartment should not have been admitted under Iowa Rule of Evidence 5.404(b) as evidence of motive or intent to rob and murder Harmon, asserting it was more probative of character than motive. Thus, she concludes, the evidence was improperly admitted and served only to prove criminal disposition and inflame the jury, such that the district court should have granted her a new trial.[14]

The district court, in the hearing on the admissibility of the drug evidence in the Durango and in the apartment, concluded they were admissible. It stated:

---

[13] The district court concluded, in the alternative, that the methamphetamine found in the Durango was also admissible under Iowa Rule of Evidence 5.404(b).

[14] We do not agree with the State's contention Hood failed to preserve error on this issue. Objections to the evidence were clearly set forth before the district court, both in the motion in limine as well as the verbal objections made on the record during trial. Furthermore, the district court ruled the evidence was admissible. Consequently, the court considered the issue and ruled on it; therefore, error was preserved. *See Lamasters v. State*, 821 N.W.2d 856, 862–63 (Iowa 2012).

The *Nelson* case is authority for the proposition that the drug-dealing activity of the defendant was relevant and admissible in that case to show—under Rule 404(b) to show motive and intent and, in a murder case, malice aforethought. Then the case—the Court gets into this balancing function under Rule 403—5.403 . . . . Obviously, it's prejudicial, not necessarily unfairly so.

. . . .

I continue to be convinced that the drugs in the Durango are inextricably intertwined with the commission of the robbery and homicide, the alleged crime.

. . . .

The safe approach also would be to point out that both sets of drugs would be admissible under Rule 404(b) to prove motive, intent, and malice aforethought under the *Nelson* case. And with regard to the set of drugs and both defendants, the probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, consideration of undue delay, waste of time, or needless representation of cumulative evidence.

Iowa Rule of Evidence 5.404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Thus, while uncharged criminal conduct cannot be admitted for propensity purposes, "the important question is whether the disputed evidence is relevant and material to some legitimate issue other than a general propensity to commit wrongful acts." *Nelson*, 791 N.W.2d at 425 (internal citation omitted). After "the court determines [that] the evidence is relevant to a legitimate issue in dispute, the court must [then] determine whether the probative value of the other crimes, wrongs, or acts evidence is substantially outweighed by the danger of unfair prejudice to the defendant." *Id.*

The record demonstrates the district court, after conducting a hearing as to the parties' positions, did not abuse its discretion when admitting into

evidence—under Iowa Rule of Evidence 5.404(b)—the drugs found in Hood's apartment and the Durango. The main issue at trial was the murderer's identity, and the context surrounding Harmon's death—specifically, the methamphetamine he was attempting to acquire, then sell—was a crucial fact to establish.

Hood's possession of methamphetamine, particularly given the quantity, was pertinent to prove both her identity as Harmon's supplier as well as her knowledge of the $1700 on Harmon's person. As Frye testified, just before the prearranged drug sale, Harmon was on the phone with a female and seemed upset. When the prearranged drug transaction was not carried out as planned, as evidenced by Harmon's anger while on the phone, Hood then had the possible motivation to rob and murder Harmon—that is, acquire the $1700 and retain the methamphetamine in her possession. This includes both the methamphetamine in the vehicle that was ready for sale, as well as the methamphetamine found in her apartment, which, again, establishes her identity as a drug dealer and Harmon's supplier. Therefore, the first prong is met, given the non-character use of this evidence.[15] *See Nelson*, 791 N.W.2d at 425–26 (holding evidence of the defendant's status as a drug dealer was properly admissible under rule 5.404(b) due to its ability to establish identity and motivation).

---

[15] The dissent disagrees with the conclusion the drugs were admissible to establish Hood's identity and motive. While we agree with our esteemed colleague that rule 5.404(b) is a rule of exclusion, the narrative of the crime would be severely lacking in logic were the drugs excluded. That is, both the reason for Hood's presence at Harmon's residence and Bindery 1—to arrange the drug deal and then supply the methamphetamine—as well as her motivation to rob and kill him when the drug transaction was aborted, would be absent if this evidence were to be excluded.

Furthermore, the court properly determined the probative value of this evidence substantially outweighed the danger of unfair prejudice. The existence and location of the drugs was central to the State's case to prove identity and motive, which indicates the evidence was of great probative value. Specifically, the narrative of the crime would be severely lacking if the drug evidence had been excluded, given the entirety of the night's events centered on Harmon attempting to sell Sanders and Stone methamphetamine, utilizing Hood and Pierce as his suppliers.

Though Hood argues the drugs found in her apartment are less probative than the methamphetamine found in the Durango, we do not agree. The drugs found in the apartment, in combination with the drug packaging paraphernalia, established Hood's identity as a methamphetamine dealer in a manner the drugs in the Durango did not. A large quantity of methamphetamine in Hood's residence is much more indicative of her status as a drug dealer, as compared to drugs found in a vehicle that, though she used, she did not own. Again, this is extremely probative of motive and identity. Thus, without the evidence of both the methamphetamine found in Hood's apartment and the Durango, the State would have been unable to establish either motive or Hood's connection with Harmon on the night of the murder. *See id.* at 426 (noting: "The State needed this type of [drug] evidence to prove its case.").

With regard to the unfair-prejudice analysis, the allegation that Hood was a drug dealer would not necessarily translate into the assumption she could commit crimes as serious as robbery and murder. This conclusion is supported

by the appropriate limiting instruction submitted to the jury,[16] as well as the State's admonition to the jury during closing arguments that this evidence was to be considered as proof of Hood's motivation and her identity, not as propensity evidence.[17]  Consequently, we conclude the district court properly admitted this evidence under Iowa Rule of Evidence 5.404(b).  *See Nelson*, 791 N.W.2d at 425–26.

The dissent sets forth a sound alternative analysis, but because we conclude the evidence was properly admitted under rule 5.404(b), we need not address the issue of whether the methamphetamine in the Durango and apartment was inextricably tied to the crime.

**V. Substantial Evidence**

Hood further claims substantial evidence does not support the jury's guilty verdicts for either the first-degree robbery or the first-degree murder convictions. She asserts the evidence regarding the identity of the shooter does not support the verdicts; nor is the evidence sufficient to establish she aided and abetted the

---

[16] This instruction states:

> You have now received certain evidence and heard certain testimony that a defendant committed certain illegal acts which are not charged in the trial information in this case.
> This evidence, specifically evidence of drugs and drug paraphernalia discovered by law enforcement during their investigation, was admitted for a particular limited purpose and for no other.
> Evidence of other crimes, wrongs or acts may not be used by you to prove the character of a person in order to show that the person acted in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, preparation, plan, knowledge, identity or absence of mistake or accident.

[17] At oral argument, Hood expressed concern that the expert testimony regarding the fact the quantity and packaging of the drugs indicated she was a drug dealer was too long and detailed, such that it greatly increased the existence of unfair prejudice. However, no objection in this regard was presented during the testimony, and we are thus unable to address the merits of this claim.  *See Lamasters*, 821 N.W.2d at 862.

actual shooter. Specifically, she argues the only evidence linking her to Harmon's murder is the cell phone records, while the video surveillance and Frye's testimony indicate the shooter was an African-American male.

Upon review of the record, and making all reasonable inferences in favor of the State, sufficient evidence supports the jury's guilty verdicts. Primarily, cell phone records establish Hood's involvement. She called Harmon while he was at Bindery 1, as well as exchanged a series of text messages with him shortly before he stepped outside and was murdered. The records show her cell phone connected through a tower four blocks away from Bindery 1 when she called Harmon at 12:49 a.m. and again at 12:50 a.m. This latter call lasted one second. The jury could have inferred from this final call that Hood wanted to locate Harmon's phone and dispose of it, particularly given Harmon's phone was never found. Additionally, she disposed of her own phone used that night and activated a second phone, which could lead the jury to conclude she had knowledge that her cell phone would be incriminating. This behavior, combined with the near-constant contact with Harmon up until his murder, links Hood to the proximity of the crime, and either as the principal or aider and abettor in the crimes committed.

Furthermore, Hood was connected to the Dodge Durango that video cameras established was at the scene at the time of the murder. She and Pierce were driving the vehicle when they went to Harmon's apartment a few hours before the murder. Additionally, Pierce was later found driving the Durango outside the apartment in which Hood was located and arrested. Several ounces of methamphetamine, packaged and concealed, were located in the vehicle, in

addition to the methamphetamine found in Pierce's residence where Hood was also living. While Hood claims the words Frye heard—"give me your stash"— refer only to drugs and not money, the jury could infer Hood's status as a methamphetamine dealer also provided motivation for the robbery. This is because she could obtain Harmon's drugs, cash, or both, and, notably, the $1700 was never found.

Though Hood maintains someone else could have used her cell phone or driven the Durango that night, no evidence was presented at trial supporting these conjectures. Thus, regardless of whether Hood pulled the trigger, substantial evidence supports the jury's verdicts finding she either robbed and murdered Harmon, or aided and abetted the person who did so. *See State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011) ("To sustain a conviction under a theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission.") (internal citation omitted)). Consequently, substantial evidence supports the jury's guilty verdicts.

## VI. Motion for New Trial

Hood's final argument asserts the district court erred when it denied her motion for new trial. Specifically, she claims the court improperly applied a sufficiency-of-the-evidence standard rather than a weight-of-the-evidence standard, pursuant to *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). She further argues the court erroneously used one fact—that her cell phone placed

her at the scene of the murder—to conclude the jury could have found Hood was responsible under a theory of aiding and abetting.

Pursuant to Iowa Rule of Criminal Procedure 2.24(2)(b)(6), a motion for new trial may be granted when the verdict is contrary to the evidence. Our supreme court has defined this standard as contrary to the "weight of the evidence." *Ellis*, 578 N.W.2d at 659. Additionally:

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain a verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner.
> On a motion for new trial . . . the power of the court is much broader. It may weigh the evidence and consider the credibility of witnesses. If the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted, the verdict may be set aside and a new trial granted.

*Reeves*, 670 N.W.2d at 202 (internal citation omitted); *see also Tibbs v. Florida*, 457 U.S. 31, 37–38 (1982).

Here, the district court made the following findings:

> After reviewing the evidence and hearing the arguments of counsel, the Court finds and concludes that the verdict in this case is not contrary to the weight of the evidence. The weight of the credible evidence supports a finding by the jury that the defendant Hood and the defendant Pierce were present at Steve Harmon's trailer at the Bindery 1 yard at the time of the shooting to sell an ounce of methamphetamine to Harmon. Hood's cell phone pinged off a cell phone tower in the vicinity of Bindery 1 at or about the time of the crime. The credible evidence suggests Hood was present with Pierce and another male and Pierce's silver or gray Dodge Durango at the scene.
> The victim . . . was shot in the back with a 120 gauge shotgun. This is a long gun and not a weapon that could be concealed from Hood's view. It is reasonable for the jury to infer that Hood knew her accomplice was armed with a shotgun at the drug deal. The jury could reasonably conclude that Hood knew the drug deal would end in an armed robbery, and that she knowingly

approved and agreed to the commission of the crime by active participation in it or by knowingly advising or encouraging the act before or when it was committed.

During the robbery Hood's accomplice used the shotgun to kill the victim . . . . Ms. Hood is criminally responsible for that murder under the felony murder rule. The jury was instructed that conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. After the crime Ms. Hood remained with Mr. Pierce. The surveillance video at the Oasis shows Ms. Hood willingly remaining with Mr. Pierce after he shot her former friend.

So weight of the evidence and considering the credibility of the evidence, the Court does not find that the verdict is contrary to the weight of the evidence. The Court does not find that a miscarriage of justice may have occurred in this trial, and the Court exercises its discretion to deny the defendant's motion for new trial.

Given this record, the district court did not abuse its discretion when denying Hood's motion for new trial. It very clearly laid out the proper parameters of the weight-of-the-evidence standard under *Ellis*, 578 N.W.2d at 659. It then employed that standard by detailing then weighing the credibility of the evidence—but did not view the evidence in the light most favorable to the State—and concluded it did not support the grant of a new trial. *See Reeves*, 670 N.W.2d at 202 ("[The court] may weigh the evidence and consider the credibility of witnesses."). Furthermore, contrary to Hood's contention, the court relied on several facts that supported the jury's guilty verdict, including the cell phone records and her involvement with facilitating the failed methamphetamine transaction. Consequently, the court did not abuse its discretion when denying Hood's motion for new trial.

After considering Hood's claims on appeal, we affirm her convictions and sentence.

**AFFIRMED.**

Mullins, J., concurs; Potterfield, J., dissents.

**POTTERFIELD, J.** (dissenting)

I respectfully dissent. I would reverse Hood's convictions and remand for a new trial because the district court abused its discretion by admitting evidence concerning the presence of drugs and related equipment in the apartment shared by the defendants and the Durango driven by Pierce.

### I. Facts and Procedural History

The defendants resided together in an apartment, which was searched pursuant to a warrant on July 7, 2013—more than twenty-four hours after the murder and robbery occurred. Methamphetamine, marijuana, measuring scales, and plastic baggies were discovered in the apartment when the police executed the warrant. Pierce was seen driving a Dodge Durango when he was arrested on July 7, but the car was owned by Erlaly Anderson. Several apportioned bags of methamphetamine were discovered in the engine compartment of the car approximately two months after the defendants were arrested and the car impounded.

Hood joined Pierce's pre-trial motion in limine to exclude evidence of the two separate caches of drugs. The motion stated:

> [The defendants] request[] the Court to prohibit the State from introducing evidence and referring to . . . [a]ny testimony or evidence concerning prior bad acts committed by the defendant[s] that is not relevant to a legitimate factual issue in dispute or, if the evidence is relevant to a legitimate factual issue in dispute, its probative value is substantially outweighed by its prejudicial nature. This would include . . . any testimony or evidence regarding . . . drugs and drug paraphernalia found at defendant[s'] apartment specifically during the execution of the search warrant utilized in this case.

At the outset of the proceedings before the district court, Pierce's counsel stated:

I discovered on Friday that some of the evidence the State intends to introduce in this case involves certain narcotics that [were] recovered from a Dodge Durango in August of this year. . . . I would add that evidence in addition to the evidence outlined in [the motion in limine] for the Court to consider and for the Court to forbid the State from entering that evidence in this trial.

The district court first sustained the defendants' motion "for purposes of voir dire only" and took the motion under advisement for final determination later in the trial. The next day, the court again addressed the motion in limine and the parties presented arguments on the admissibility of the evidence. Following arguments, the court orally issued its decision on the motion. The court held the evidence of the drugs found in the car was inextricably intertwined with the charged crimes of robbery and murder. It held alternatively the drugs in the car were admissible under Iowa Rule of Evidence 5.404(b) for nonpropensity purposes. It further ruled evidence of the drugs found in the apartment was admissible under rule 5.404(b) for nonpropensity purposes. It nominally held the probative value of the evidence substantially outweighed the risk of unfair prejudice, but it did not engage in an analysis to explain how it reached its conclusion on the balancing test. *See* Iowa Rule of Evidence 5.403.

During the State's case, the packaged drugs were admitted as exhibits and five law enforcement witnesses testified about the drugs found in the apartment and in the vehicle. The State first offered the photographic and physical evidence obtained from the apartment during the testimony of Detective Lorna Garcia. Both Pierce and Hood objected to each individual exhibit as it was offered, and the court overruled each objection. Garcia's testimony as to the objectionable evidence was a description and discussion of each of the already-

admitted exhibits. Later in the trial, Sergeant Brad Kress also testified about the evidence found in the apartment, describing what he saw in the apartment as reflected by two previously objected-to and admitted photo exhibits.

The State first offered the photographic and physical evidence obtained from the Durango during the testimony of Officer Brady Carney. Again, both Pierce and Hood objected to each individual exhibit as it was offered, and the court overruled each objection. Carney's testimony as to the drugs found in the car was a description of each photo as the State offered it for admission. Later in the trial, Investigator Angela Dierenfeld and Officer Brad Youngblut both testified regarding the drugs found in the car. Their testimony reflected the content of the previously-admitted exhibits and Carney's testimony. The defendants did not object to the elements of Dierenfeld's testimony or Youngblut's testimony confirming previously-admitted evidence.

The law enforcement witnesses testified at length about the packaging, amounts, and likely import of both groups of drugs as indicative of drug dealing. All such testimony was given following the admission of the relevant exhibits and made by reference to the admitted exhibits or other related testimony.

The district court admitted all this evidence under the inextricably-intertwined doctrine and rule 5.404(b). I disagree either theory justified admitting the evidence. I further disagree the probative value of the admitted evidence outweighed the heavy risk of unfair prejudice even if the evidence was otherwise admissible.

## II. Error Preservation

As a preliminary matter, the State asserts Hood has not fully preserved error on these two evidentiary claims. I disagree. Hood joined Pierce's motion in limine, which the district court took under advisement pre-trial and later rejected. She objected to the admission of all relevant exhibits as they were offered, and her objections were overruled. The State now claims that her failure to object to witnesses' testimony regarding the previously-admitted, objectionable evidence and exhibits should be deemed a partial waiver of error.

"The preservation of error doctrine is grounded in the idea that a specific objection to the admission of evidence be made known, and the trial court be given an opportunity to pass upon the objection and correct any error." *State v. Brown*, 656 N.W.2d 355, 361 (Iowa 2003). In circumstances such as these in which objection was raised pretrial, raised again as the exhibits were offered, but not repeatedly renewed each time the objected-to evidence was discussed throughout the trial, "the spirit of the rule [is] met." *See id.* Error has been preserved for our review. *Id.*

## III. Inextricably-Intertwined Doctrine

First, the evidence of drugs found in the Durango is not inextricably intertwined with the charged crimes. "Inextricably intertwined evidence is evidence of the surrounding circumstances of the crime in a causal, temporal, or spatial sense, incidentally revealing additional, but uncharged, criminal activity." *State v. Nelson*, 791 N.W.2d 414, 420 (Iowa 2010) (citations omitted). Under the inextricably-intertwined doctrine, the evidence of the uncharged crime must be "so closely related in time and place and so intimately connected to the crime

charged that it forms a continuous transaction." *Id.* at 423. We only admit the evidence "when a court cannot sever this evidence from the narrative of the charged crime without leaving the narrative unintelligible, incomprehensible, confusing, or misleading." *Id.* The doctrine "should be used infrequently and as a narrow exception to the general rule against admitting evidence of other crimes, wrongs, or acts." *Id.*

It cannot be said the presence of drugs in the Durango form part of a continuous transaction that included murder and robbery. The drugs are not related in a causal, temporal, or spatial sense—the murder and robbery occurred in an entirely different area of the city more than a day before the car was impounded and two months before this evidence was discovered. There was no evidence presented at trial that the drugs were in the vehicle at the time of the murder. The Durango was not located or impounded until well over twenty-four hours after the murder. And the record does not definitively show—it at most suggests—that the vehicle in which the drugs were found was actually the same vehicle that appeared at the scene of the crime.

Furthermore, the State's narrative of the crime remains completely intact if the evidence of the drugs discovered in the vehicle had not been admitted into evidence. The State argues the presence of the drugs demonstrates that Hood and Pierce were drug dealers with the capacity to provide the victim with drugs on short notice. The district court, in describing its decision to admit the evidence, stated, "[The evidence] is relevant to bolster the State's theory of the case that Mr. Pierce and Miss Hood were the source of the drug transaction . . . ." However, the evidence cannot be admissible merely because it

*supports* the State's narrative; it is only admissible if its absence renders the State's narrative "unintelligible, incomprehensible, confusing, or misleading." *Id.*

Though the majority expressly declines to rely upon the inextricably-intertwined doctrine, it nevertheless finds "the narrative of the crime would be severely lacking in logic were the drugs excluded." I disagree. The State's theory of the crime and its narrative simply do not require evidence of the defendants' actual capacity to supply drugs to buyers, particularly since the State's theory was that no drugs were exchanged.

The inextricably-intertwined doctrine requires a high degree of symbiosis between the circumstances of the charged crime and those of the uncharged crime. This case does not approach that threshold.

The State argues its burden to satisfy the requirements of the inextricably-intertwined doctrine should be lower than the standard I have applied. Our supreme court in *Nelson* quoted a scholarly article discussing five categories of inextricably-intertwined evidence used in other jurisdictions. *Id.* at 421–22 (quoting Jennifer Y. Schuster, *Uncharged Misconduct Under Rule 404(b): The Admissibility of Inextricably Intertwined Evidence*, 42 U. Miami L. Rev. 947, 962 (1988)).

> These five categories include: (1) uncharged misconduct that was a necessary preliminary step toward completing the crime charged, (2) uncharged misconduct that is directly probative of the crime charged, (3) uncharged misconduct that arises from the same transaction or transactions as the crime charged, (4) uncharged misconduct that forms an integral part of a particular witness' testimony concerning the crime charged, and (5) uncharged misconduct that completes the story of the crime charged.

*Id.* at 422 (citation and internal quotation marks omitted). The court noted the fifth category has received the most harsh scholarly criticism of the five categories. *Id.* at 422–23.

The State's argument equates the *Nelson* court's discussion of the scholarly literature as an adoption of all five categories of inextricably-intertwined evidence and as a holding that the first four categories have a lower legal threshold for admissibility. Our case law does not support the State's characterization of the *Nelson* decision. In *Nelson*, the court did not specifically analyze or adopt any of the first four categories. *See id.* at 423–24. The State has cited no case law in Iowa applying the other categories, nor has it cited any authority for the proposition that those four categories, if they are applicable in Iowa, are subject to a lower threshold of admissibility.

Regardless, the merits of the State's arguments as to the application of the other categories were not specifically asserted to or relied upon by the district court. And they are not persuasive. First, the State argues that possession of the drugs in the Durango was a preparatory step toward completing the robbery and murder. This is not supported by the record. The robbery and murder as presented in the State's theory of the case did not require the presence of drugs at the scene of the crime, where the robbery and murder occurred apparently without the exchange or even display of drugs. It was not a necessary preliminary step for the murderer to have hidden drugs in the engine compartment of the car before committing the charged crimes. Second, the State issues the conclusory statement that the possession of the drugs was directly probative of the charged offenses. However, it fails to assert any actual

direct connection between the crimes charged and the presence of drugs in the engine compartment of the car. On the record before us, there is none. Lastly, the State argues the "discovery of drugs in the suspect vehicle seized the day after the murder provides close proximity in time and place such that the uncharged offense forms a continuous transaction with the charged offenses." I disagree with the notion that a car that may or may not have been at the scene of a murder and that was discovered and impounded miles away from the scene and over twenty-four hours after the perpetration of the crime bears a "close proximity in time and place" to the murder and robbery. Nor do I agree with the notion that the presence of drugs—which were obviously not ultimately sold to the victim—forms a continuous transaction with the murder and robbery.

The State has not demonstrated that categories of inextricably-intertwined evidence other than evidence that completes the story of the crime are admissible under Iowa's inextricably-intertwined doctrine. Even if that evidence is admissible, the State has not demonstrated that those categories would be subject to a lower burden of admissibility. And even if those categories of evidence are subject to a lower burden, the State has failed to show that the presence of the drugs in the car is inextricably intertwined with the charged crimes under any of these alternative categories.

### IV. Non-Propensity Purposes

Second, the evidence is not admissible under rule 5.404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule is foremost a rule of *exclusion* as reflected by its first sentence, and our courts guard against casual reliance on the exceptions listed in the second sentence, which would otherwise transform the provision into a rule of *inclusion*. *See State v. Sullivan*, 679 N.W.2d 19, 28 (Iowa 2004); *see also State v. Little*, No. 08-1125, 2010 WL 786011, at *12 (Iowa Ct. App. Mar. 10, 2010) ("[I]ntent is almost always an issue in a criminal case. So that the 5.404(b) exception does not swallow the rule, it is important the evidence bear *directly* on intent, rather than passing through the filter of character or propensity.").

The district court held "that both sets of drugs would be admissible under rule 5.404(b) to prove motive, intent, and malice aforethought . . . ." However, the court failed to provide an analysis explaining how the proffered drug evidence actually bore upon motive, intent, or malice. Upon my review of the record, I see no connection between the drugs, their packaging, or the paraphernalia and the motive or intent to murder Harmon.

Evidence of the mere presence of drugs found in a vehicle—under the air filter and not in the passenger compartment—or in an apartment miles away from the scene of the crime is not instructive as to a purported drug dealer's motive to kill his or her purported customer. Nor does it demonstrate that the dealer had any intention to kill his or her customers. It certainly does not demonstrate that a dealer acted with malice aforethought related to his or her customer. The mere fact that a person possesses and sells a product, whether legally or illegally, does not give rise to a reasonable inference that the seller is motivated or intends

to kill the buyers of that product to take their money. The evidence only shows that Hood was involved in dealing drugs and therefore likely to commit violent crimes—prejudicial propensity evidence.

The majority believes "[w]hen the prearranged drug transaction was not carried out as planned, *as evidenced by Harmon's anger while on the phone*, Hood then had the possible motivation to rob and murder Harmon . . . ." (Emphasis added.) The majority's conclusion demonstrates the State's case as to motive was made independently of the contested drug evidence. In the majority's own view, the testimony regarding Harmon's angry telephone conversation—*not* the discovery of drugs miles or months removed from the scene of the crime—is the evidence bearing upon motive. The drug evidence, on the other hand, is not directly probative and is therefore not admissible evidence of Hood's purported motive for killing Harmon.

The State argues the drug evidence was relevant as to the identity of the killer. Today, the majority accepts this assertion as a proper nonpropensity purpose for admission of the evidence. However, the State did not assert this purpose at trial, nor did the district court admit the evidence on that basis. The State's argument that the evidence should be admitted for the purpose of identification is raised for the first time on appeal and is therefore not properly before us. However, even if we consider the State's argument as the majority has done, the evidence is not admissible for its newly-claimed purpose. The evidence was not necessary to identify Hood or Pierce as Harmon's supplier. Nor was it not probative on the questions of the identity of Harmon's murderer or the identity of his drug dealer, since that connection was the subject of other

testimony properly admitted at trial. The State made its case as to identity with the admission of other relevant evidence including Hood's phone records and trial testimony regarding Harmon's relationship with Hood and their past transactions.

The only way the evidence of the presence of drugs, without more, could reflect upon a drug dealer's motive or intent to murder a customer is by raising an impermissible inference of the dealer's propensity for unlawful activity, which is precisely the misuse of evidence against which rule 5.404(b) is in place to protect. The evidence in this case impermissibly "appealed to the jury's instinct to punish drug dealers." *See State v. Liggins*, 524 N.W.2d 181, 188–89 (Iowa 1994).

The risk of unfair prejudice in these circumstances is so high as to be a virtual certainty, and the probative value as to the defendants' motive, intent, malice, or identity is negligible. *See Sullivan*, 679 N.W.2d at 25; Iowa R. Evid. 5.403. The State argues the district court's limiting instruction was sufficient to remove any danger of prejudice. However, "[b]ad-acts evidence diverts the jury's attention from the question of the defendant's responsibility for the crime charged to the improper use of the defendant's bad character." *Sullivan*, 679 N.W.2d at 24 (citation omitted). "Consequently, even if the trial court gives a carefully crafted instruction limiting the significance of such evidence, prejudice to the defendant is well-nigh inescapable." *Id.* (citation and internal quotation marks omitted). The evidence was not admissible under rule 5.404(b), and the court's limiting instruction could not sufficiently mitigate the prejudicial effect the evidence had on the jury.

**V. Harmless Error**

The State argues that the district court's error in admitting the evidence was harmless. *See State v. Henderson*, 696 N.W.2d 5, 12 (Iowa 2005) (noting non-constitutional error is reversible only when the rights of the complaining party have been injuriously affected); Iowa R. Evid. 5.103(a). "We presume the defendant's rights have been prejudiced unless the State can affirmatively establish otherwise." *State v. Howard*, 825 N.W.2d 32, 41–42 (Iowa 2012).

The State asserts the evidence was cumulative of other properly admitted evidence and its admission therefore did not injuriously affect the defendants. I disagree. The admitted drug evidence was not cumulative because it improperly put before the jury the size and scope of a drug dealing operation, which could not have been established without exhibits and testimony from law enforcement witnesses regarding the discovery of the drugs in the apartment and vehicle. Law enforcement testimony discussing the objected-to and admitted exhibits is not independently cumulative of the exhibits themselves, and both the exhibits and the law enforcement officers' testimony were improperly admitted. Testimony from the defendants' social acquaintances did not reflect the size or scope of the defendants' selling operation and was therefore not cumulative of the objectionable evidence. Admission of the evidence therefore injuriously affected both defendants by needlessly characterizing them in the unfavorable light of high-volume drug dealers.

**VI. Conclusion**

Evidence showing the presence of drugs in the vehicle was not inextricably intertwined with the robbery and murder. Neither that evidence nor

evidence of drugs found in the apartment was admissible to show the defendants' motive, intent, identity, or malice aforethought. The evidence of either drug cache is highly prejudicial and minimally probative. It was therefore impermissible character evidence, and the district court abused its discretion by admitting it. I would reverse and remand for a new trial at which all evidence of drugs and drug-related equipment found in the apartment and vehicle would be suppressed.