# IN THE COURT OF APPEALS OF IOWA

No. 18-1612
Filed September 11, 2019

**BENAIAH MABLIN,**
        Applicant-Appellee,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Clinton County, John D. Telleen,

Judge.

The State appeals the district court's grant of postconviction relief to

Benaiah Mablin. **REVERSED AND REMANDED.**

Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney

General, for appellant State.

John J. Wolfe, Clinton, for appellee.

Considered by Mullins, P.J., Bower, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**BOWER, Judge.**

The State seeks reversal of the district court's ruling granting postconviction relief (PCR) to Benaiah Mablin on the ground the court failed to properly analyze the ineffective-assistance-of-counsel claims. Because we conclude Mablin has failed to prove the requisite prejudice, we reverse the district court and remand for dismissal of the PCR application.

**I. Background Facts and Proceedings.**

On December 13, 2007, at 5:02:57 p.m., a 9-1-1 caller reported finding blood in the building elevator leading to an apartment (Apartment #3) where neighbors found a bloody body after the resident's child opened the door for them. Officers were dispatched to the apartment, found Sandra Chambers-Singh dead, and took statements from the neighbors.

Neighbors Jeff Howard and Shelia Grant informed the officers they believed Chambers-Singh was selling or using crack cocaine. Howard also told the officers to speak with the tenants of Apartment #1 because they were friends with Chambers-Singh. Howard also informed the officers he had seen the male tenant who lived in Apartment #1, Corey Campbell, knock on Chambers-Singh's door earlier in the day around 1:00 or 2:00 p.m. Another neighbor, Janet Domer, informed police that if Chambers-Singh was dead then "either C-Note or Ren killed her." C-Note—Carley Campbell Sr.—was Corey Campell's uncle. Ren—Lorenzo Dodd—was Chambers-Singh's ex-boyfriend.

An officer interviewed Ginger Noble, who stated that at about 4:00 p.m. on December 13, she entered the elevator on the second floor of the apartment building and encountered a black male bleeding from his facial area. She stated

the black male was approximately six feet tall, wore a red stocking cap, and a blue "puffy" winter coat.

Corey Campbell gave a statement to Officer Michael Adney, whose report provides, in part:

> On 12/13/07, I interviewed Corey Campbell at . . . Apartment #1. Corey told me he lived with his grandmother in that apartment since October 2007.
> Corey told he left the apartment at 1700 hrs. Corey said he got back to his apartment somewhere between 1730 and 1800 hrs. He said he went out to get his hair braided, but did not find anyone to braid it.
> I asked Corey if he knew who lived in apartment #3. He said a black girl named "Sandra". He said he knew Sandra since about December 2006. He met her through a girl named "Jasmine", Corey Campbell's uncle Carley Campbell's girlfriend.
> I asked Corey Campbell if he heard any yelling or noises. Corey said between 1630 and 1640 hrs., he heard arguing and went to his apartment door. The yelling came from Sandra's apartment, so he knocked on her door. Corey said he knocked on Sandra's Apartment, #3, between 1640 or 1650 hrs. He felt unsure on the time. When he knocked on the door, Sandra's son . . . opened the door. Corey saw Sandra sitting on her bed in the bedroom, crying. Corey said he walked in the apartment and stood by the refrigerator while he spoke with Sandra. Corey said he did not see anyone else in the room at the time and did not see any blood. Sandra told Corey she was fine. Corey left.
> Corey said he returned between 1730 and 1800 hrs. As he passed by #3, he knocked on the apartment and no one answered, so he assumed no one remained in the apartment.
> . . . .
> I asked Corey if he knew if Chambers-Singh owned a vehicle. Corey said she drove a white or tannish minivan.

Carley Campbell Jr. (son of Carley Campbell Sr.) was interviewed by Officer Dannie Howard at about 7:45 p.m. Carley stated he arrived at Apartment #1 at about 5:00 p.m. and used the stairs to get to the second floor. He stated he did not remember seeing anyone in the hallway or the stairway when he arrived. He told the officer he visited with Corey and another person

and, when he was leaving at about 6:08 p.m., police asked him to remain in the apartment. Carley stated he had not seen Chambers-Singh on December 13.

Meanwhile, at 5:03 p.m., Officer Dan Sager was dispatched to a hospital to investigate a man who claimed to have been assaulted. Officer Sager met the man, Mablin. In his report, Officer Sager notes:

> Mablin said he was an informant for the police department, which I knew from previous encounters. He told me, he was out near the railroad tracks by Hy-Vee on 11th Avenue South and 4th Street and said he was picked up in a gray Cadillac and was going to purchase some cocaine from a guy he knew as "B."
> . . . .
> Mablin said he got into the car, sat in the rear passenger seat, was told to get out and get up in the front driver's side. Mablin said at this point, they drove under an underpass, under the tracks. He said it was out past Hy-Vee, going into south Clinton. He told me once they made it under the under pass, they took an immediate left and then took another immediate left into a curve. He said they drove slowly back here. He said the driver was on the cell phone the whole time and the subject he knew as "B" was calling him a "snitch", calling him a "cop" and said "F him up like this". Mablin told me at this point he was in fear of his safety as they were going into an area he wasn't familiar with in Clinton.
> . . . .
> Mablin said the driver grabbed at his arm. I asked which arm and he said it was the left. I did not see any marks on his arm. He then said somebody grabbed his neck. Mablin then opened up the passenger side door and he told me he rolled out. I asked him how he got the marks on his face and the cut on his hand. He said he did not know.

Mablin told Officer Sager he had $347 with him and had given it to one of the people in the car because he was going to buy crack. The officer "asked if it was okay if I could take his clothes with me as they were part of the assault scene and I thought there may be blood on from the suspects on the clothes." Mablin

agreed, and Officer Sager "placed them into some bags I had from the hospital and took them to my squad car."

Mablin's aunt, Sharon Holmes, had accompanied Mablin to the hospital and told Officer Sager that Mablin arrived at her home at 4:30 p.m. and was bloody. Mablin told her he was in a car with some people, had some money taken, and was pushed out of the car. Holmes said that when Mablin entered he asked to wash his clothes, which included a blue "puffy" winter coat, an orange swimsuit, tan pants, blue polo shirt, underwear, and a pair of socks. Holmes gave Mablin clothes to wear and took him to the hospital.

Mablin was taken to get x-rays. While Officer Sager was in the waiting room, he received a call from Officer Dean Ottens, "telling me Mablin may be involved in an incident on South 3rd Street."

Officer Brian Pohl arrived at the hospital about 7:30 p.m. and spoke with Mablin's aunt. Holmes told Officer Pohl that Mablin arrived at her house about 4:30 p.m. and she saw that his left hand was bleeding. He was wearing brown pants and a "black puffy coat." Mablin asked if he could wash his clothes and he "put all his clothes in the washing machine" and started it. Holmes gave Mablin some of his uncle's clothes (Leon Holmes) to put on and then drove him to the emergency room.

Officer Pohl spoke with Mablin:

> I went in to speak with Mablin. I noticed his left [hand] wrapped and a significant amount of blood on the bed sheet, underneath his left hand. I asked Mablin what happened. He stated he got robbed. Mablin indicated he left work from Wal-Mart around 0100 hours on 12/13/07. He walked to Leon Holmes' house, knocked, but nobody answered the door. He ended up with Charles LNU, whom he described as a black male living somewhere off Bluff. Mablin

indicated he partied with Charles for a period of time. He received his wages from Wal-Mart on 12/13/07.

Mablin stated the next morning, sometime after he woke up, he walked toward the bread store, down 4th Street, and located "B", driving a silver or gray Cadillac. Mablin indicated he got in with "B", in the front seat. Mablin stated he planned to purchase crack cocaine from "B". Mablin stated two other people sat in the back seat. Mablin indicated they drove around for a short period. "B" drove the vehicle and started accusing of him of being a "narc". Mablin indicated they started fighting, took his billfold, and took the money out of it. Mablin indicated he opened the passenger door and jumped out of the vehicle. In the process, Mablin cut his hand on the door. This happened near the Dairy Queen on Camanche Avenue.

Angel, who described herself as a former crack addict, approached Officer Pohl at the hospital and stated she knew Mablin, knew he got off work at about 1:00 a.m., and knew he did not show up at the Victory Center after work on December 13. She told the officer she knew "B" or "Big Lord," his real name was Flinda, and he drove a gray colored Cadillac.

Officer Pohl's report indicates, "I asked Mablin to come down to the police department. I asked if his aunt or uncle could give him a ride. He agreed to go, if they gave him a ride." Leon Holmes agreed to give Mablin a ride, and Sharon informed Officer Pohl she was taking her two small children home. Officer Pohl told Officer Sager to take Sharon Holmes back to her residence and asked Holmes "not to disturb any of Mablin's clothing or blood." Officer Pohl spoke again with Mablin, informed him "Leon planned to bring him to the police department. He agreed to come."

Officer Pohl's report indicates he remained at the emergency room until Mablin's release and "Mablin got into Leon's vehicle." Officer Pohl arrived at the police station at "2044 hours."

Mablin and his uncle drove to the police station to provide Mablin's statement about the robbery. Officers Pohl and Department of Criminal Investigations Special Agent Matt George were instructed by their superior to speak with Mablin. A partial transcript of the interview is provided, though the transcriber begins with the caveat, "The first 23:04 minutes of the recording are unintelligible." No times are indicated on the transcript and we are not provided the original recording.

At 11:25 p.m. Officer Pohl read *Miranda* warnings to Mablin. A search warrant for Mablin's tennis shoes, DNA buccal swabs, samples of pubic and head hairs, and fingernail scrapings was obtained by Corporal Reid and, at about 1:15 a.m., Officer Howard obtained DNA swabs, Mablin's sweatpants, and his tennis shoes. Mablin was transported back to the hospital emergency room where the biological samples were obtained.

The next morning, December 14, 2007, Chambers-Singh's minivan was found near the house of Mablin's aunt. *State v. Mablin*, No. 08-1180, 2009 WL 2185552, at *4 (Iowa Ct. App. July 22, 2009). There were blood stains on the driver's side door and inside the minivan. *Id.*

Pastors Ray Giminez and Rob Miltenberger, the executive director and assistant pastor of the Victory Center, the shelter at which Mablin was staying, questioned Mablin at the shelter about what happened when he returned there at about 8:30 p.m. on December 14.

> While in Pastor Miltenberger's office, Mablin admitted to the two men that he had not told the truth to the detectives. Mablin indicated that the lack of an attorney was the reason he had not told the truth, but now he was ready to come clean.

Mablin related a different version of events to the pastors. He told them he and Chambers–Singh had gone to Davenport and bought drugs, and then returned to her apartment. They proceeded to take the drugs and have sex. At that point, Mablin claimed that a couple of unidentified men entered the apartment. One of them hit Mablin hard on the back of the neck. Mablin pulled up his pants and ran out of the apartment, driving off in Chambers–Singh's minivan. As he was leaving the apartment, Mablin said he heard the victim screaming and felt bad for not going back to save her. According to Mablin, the minivan ran out of gas and he had to walk part of the way to his aunt's house. While en route, he fell, cutting his hand. After listening to this story, Pastor Giminez told Mablin he "needed to tell the truth," and Mablin volunteered to go to the police station. Pastor Miltenberger phoned the Clinton Police Department, made arrangements for an interview, and both pastors accompanied Mablin to the station.

*Id.* at *2.

Mablin then went to the police station with Miltenberger and Giminez and spoke with Captain Randy Meier and Officer Howard. Mablin was read *Miranda* warnings. He was informed Chambers–Singh was dead. Mablin stated he did not know that and "I shouldn't have left, I know." He stated he was sorry for her death.

At this point, Captain Meier stated:

No, that's . . . that's not what you're telling me. You caused her death, Ben. We know that. Okay. We know that you caused her death? The question we need to have answered is are you sorry you caused her death. Because if you're a man who is sorry, if you're a man who has a heart, than that's somebody we can work with.
. . . .
I only want to talk with somebody who's truly sorry . . . .
. . . .
Because I know exactly where the blame rests and so do you. Okay. And that's what I'm interested in hearing.

Mablin then stated that he and Chambers-Singh purchased some rock cocaine and went back to her apartment to get high. While there, Mablin "got hit in the back of the neck while I was having sex." He continued with his rendition of the afternoon events, stating Chambers-Singh's child was somewhere in the

apartment but Mablin did not see the child. He repeated that while the two of them were having sex, someone hit him on his back, he ran out of the apartment, and "I was in [Chambers-Singh's] car and I drove the car from there down the street and it had no gas." When asked what he was wearing, he said he had on "my blue coat and I had on my blue shirt and I had on my brown pants." He had not removed his pants to have sex, just pulled them down. When asked to describe his coat, he stated, "it's like a bubble coat." He later said he saw two men in the apartment, whose faces he avoided looking at, as he ran out. The person in the bedroom had "a little black figure in in his hand" that "looked like a gun to me." He was able to get to the elevator and was bleeding—"I had thought he had chopped my fingers off and he shot me or something." When asked how he got the keys to Chambers–Singh's vehicle, Mablin stated, "I had got the keys from her earlier when we was together." When asked why he had stopped the van where he did, Mablin stated:

> Because I looked and it didn't have no gas and I didn't want to be stuck. So I didn't want to bleed to death or nothin', so I tried to get the closest I could so I went to walking up the street. . . . I didn't know even really where I was at. I was so confused . . . .

Mablin acknowledged lying to Sharon Holmes when he arrived at her residence. He acknowledged lying to police during his previous encounters.

Captain Meier then told Mablin he was not telling the truth, stating, "I'm coming to the realization that I can't work with you." Captain Meier made a few more statements, "that's not what I want to work with, okay" and "I want to work with somebody who is willing to . . . completely bare their soul." Captain Meier then stated, "And until you can take responsibility for that, I don't . . . I can't . . . I

don't think there's anybody that can work with you." He told Mablin to take responsibility and "when you do that, you're gonna feel a lot better for it."

> At this point (around 11:15 p.m. on December 14), the Clinton Police Department captain who was leading the interview confronted Mablin. He made it clear that he did not believe this story. Thereafter, Mablin slowly began to provide yet another version of events. Mablin said that after he had done drugs and had sex with Chambers-Singh, they had had a disagreement. Chambers-Singh wanted some additional rocks of crack cocaine that were in Mablin's coat, and Mablin resisted. Chambers-Singh came after him in the bedroom with a knife that she had obtained in the kitchen. According to Mablin, he did not even notice that she cut him. Mablin then picked up the same knife. He admitted stabbing Chambers-Singh numerous times. Mablin said he was "swinging." Mablin admitted that "I could have walked away, but I wasn't thinking." After Mablin was done stabbing Chambers-Singh, he left the apartment, drove off in her minivan, and proceeded to his aunt's house—intentionally leaving the minivan some distance from the house.

*Id.* at *3 (footnotes omitted).

Following the December 14 to 15 interview, Mablin was arrested. When Mablin was fingerprinted by Officer Daniel Broderick, Mablin stated, "I didn't mean for her to die. I can't believe she is dead. A man can't defend himself these days."

It was later determined Chambers-Singh had died after suffering eighteen to twenty stab wounds, including wounds to her chest, face, skull, and neck and "defense wounds" to her wrists and hands. Several of the wounds were located on the back of Chambers-Singh's neck. DNA analysis was performed later, and it was determined the blood in the apartment came from both Chambers-Singh and Mablin. *Id.* at *1.

On December 17, 2007, Mablin was charged with one count of first-degree murder for the stabbing death of Sandra Chambers-Singh.

Mablin's trial counsel filed a one-paragraph motion to suppress

all testimony or other evidence of any statements made by the defendant to law enforcement personnel or their agents, as such were a result of defendant's being under the influence of a controlled substance, an unduly protracted series of interviews, promises of leniency and the defendant's misplaced reliance on advice from his Pastors.

The motion was heard on May 14, 2008. Officers Howard and Pohl testified, and Mablin's counsel admitted into evidence the audio recording of the interview Mablin attended on the afternoon of December 14.

On May 19, the motion was denied upon the following findings of the trial court:

The court determines the credible evidence shows that [Mablin] was interviewed four times by officers between the dates of December 13 and 14 of 2007. The first interview took place at Mercy North Hospital on the evening of December 13, after [Mablin] had presented there for treatment of his injuries. That interview took less than one half hour. [Mablin] was next interviewed later in the evening on December 13 at the Clinton Police Department for a period of more than one hour. The third interview occurred on the afternoon of December 14 at the Victory Center, which is a Christian outreach and religious center in Clinton. This interview also was more than one hour in length. It should be noted that during these first three interviews [Mablin] was free to go and in fact left the interview site on each such occasion.

The final interview took place at approximately 10:30 p.m. on December 14 at the Clinton Police Department, after [Mablin] contacted officers and told them that he wanted to speak with them. Although the evidence is unclear as to who all was present during the second interview on December 13, it is clear that during the two interviews on December 14 [Mablin] was accompanied by two pastors from the Victory Center, and that both pastors stayed with [Mablin] during the entirety of both of those interviews.

The evidence demonstrates that during all of the interviews [Mablin] did not appear to be under the influence of alcohol or drugs, that he was oriented to time and place and responded to questions accordingly. The evidence does not show that the officers employed any promises of leniency to [Mablin], and the interviews themselves were not so frequent or lengthy as to suggest that [Mablin's] will was overborne or that his capacity for self-determination was affected. The evidence further reflects that the atmosphere during all the

interviews was not coercive, and that [Mablin] was not deprived of his freedom in any way.

After a jury trial, Mablin was found guilty of the lesser-included offense of second-degree murder. He was sentenced to a fifty-year prison term.

On appeal, Mablin alleged statements he made to his pastors at the Victory Center, and about which Pastor Giminez testified at trial, violated the priest-penitent privilege. *Id.* This court determined we need not consider the issue because "[w]e believe that Mablin was not 'injuriously affected' by the alleged error, which . . . was not of constitutional dimensions." *Id.* at *5. We stated:

> In this trial, as in any trial, some items of evidence loom larger than others. Here we believe the critical evidence consisted of the physical evidence of Chambers-Singh's wounds, and Mablin's final recorded interview, which the jury viewed in its entirety. Pastor Giminez's testimony took up only nine transcript pages, and the State referred to it only briefly in closing argument. Even without Pastor Giminez's testimony, the State would have proved that Mablin told a false story about jumping out of a car at least five separate times. The State would have proved that with two pastors by his side, Mablin told an elaborate forty-minute lie to the detectives about having been hit on the back of his neck by an unknown assailant, a story that he proclaimed was the "honest to God" truth and at the end of which he broke down in tears of regret for having supposedly left Chambers-Singh to this assailant and other unknown individuals.

*Id.*

Mablin filed a PCR application on October 16, 2009. After a several-year delay and amendments made to the application, Mablin claimed trial counsel was ineffective in (1) failing to move to suppress testimony from an emergency room paramedic, Steve Paulsen (who testified Mablin stated that he had been kidnapped and robbed and had gotten injured when jumping from car); (2) in failing to obtaining suppression of a December 13, 2007 interview of Mablin at the Clinton Police Department; (3) failing to obtain suppression of the second December 14,

2007 interview of Mablin at the Clinton Police Department (claiming promises of leniency were made); (4) failing to investigate alternative suspects (the occupants of apartment #1); and (5) failing to move to suppress the search warrant that was signed and executed at the conclusion of the December 13, 2007 interview (claiming there was no probable cause to believe the "elevator man" noted in the warrant was Mablin).

The PCR trial was held on August 23, 2017. The district court granted postconviction relief, ruling trial counsel did not adequately investigate, noting trial counsel "spent a total of ten hours preparing for a first-degree murder trial, with dozens of potential witnesses, information regarding potential alternative suspects and yet performed no independent investigation."[1] The court ruled:

> The court finds that the minimal effort [Attorney] Ingham put forth in communicating and advising [Mablin] and failure to conduct any investigation or depose any witnesses fell below the standard of a reasonably competent practitioner. In addition, irrespective of whether stemming from his lack of his communication with his client, Ingham's failure to investigate or follow up with multiple parties breached an essential duty of counsel. It is unreasonable for counsel to not investigate statements that could provide a defense to their client. In the same light, the statements that Corey and Carley Jr. provided to police were not consistent with each other, and did not correspond with the timeline for Sandra's death. Thus, to not explore these statements—especially when Corey's statement would have made him the last person to see Sandra alive—was wholly insufficient, and cannot be considered to meet the standard of a reasonably competent attorney.

The PCR court next addressed the motion to suppress, noting trial counsel "filed a one-sentence motion to suppress defendant's statements to the police,

---

[1] Counsel testified the hours noted on the "partially filled out case closing sheet" did not accurately show the time he spent on a case. He stated, "I was paid a salary. Whether I billed a client or not was of no consequence to my income."

including defendant's eventual confession, and did not see fit to provide the trial court with the lengthy video recorded interrogations nor the transcripts of the interviews to provide a basis for his motion." The PCR court addressed both the December 13 interview at the police station and the second December 14 interview Mablin requested.

With regard to the December 13 interview, the PCR court stated:

In this case, [Mablin] made it clear that he did not want to go to the [police station] [(CPD)] from the hospital. The officers stated that if he refused to go voluntarily that he would be taken to the CPD. Moreover, they provided him with a police escort to the CPD. Once at the CPD, [Mablin] was kept in an interrogation room and always in the presence of officers. Although the officers informed [Mablin] that the purpose of the interview was to address the alleged robbery, in reality it was so they could obtain a search warrant as [Mablin] was a suspect in Sandra's murder. The officers told [Mablin] he was free to leave, but he was in a hospital gown, and the officers would not let him leave with his shoes or pants. Therefore, if the trial court had been provided with a thoroughly developed record regarding these facts there is a reasonable probability that the court could have found the December 13, 2007 interview was a custodial interrogation, and that the Applicant's Fifth Amendment rights were violated. . . . It is not necessary for this court to determine at this junction that the outcome would have in fact been different. The point is that this argument was never even developed or raised for the trial court to consider.

As for the December 14 evening interview, the PCR court found that most telling of trial counsel's lack of diligent effort was that he had not provided the transcripts and the recordings of the interviews to the court at the suppression hearing. The court concluded,

In order for there to be any chance whatsoever for the trial court to properly analyze whether the language used during an interview amounted to a promise of leniency the trial court of course needed to be given the relevant information—the actual transcript or the video recording of the December 14, 2007 interrogation.

The court noted,

[Attorney] Ingham testified that he did not provide support for the motion to suppress or call a witness at the suppression hearing because the burden was on the State. Although theoretically true, when counsel does not put forth any effort in drafting the motion to suppress, and then does not provide any evidence at the suppression hearing, the State can easily meet their burden.

. . . .

. . . [T]he only evidence in front of the trial court was Officer Howard's testimony that no promises of leniency were made. Although Ingham cross-examined Officer Howard, this performance falls below the standard of a reasonably competent attorney. Ingham was in possession of the evidence that was necessary for the trial court to find promises of leniency, yet failed to provide it to the trial court. Thus, without the necessary evidence, the trial court could not determine whether law enforcement officers adopted the pastor's statements that everything would go away if [Mablin] told the truth. Further, the trial court could not properly analyze the context of the officer's statements that referenced working together because Ingham did not inform the trial court that [Mablin] was working for the CPD as a confidential informant at the time of the interview. Therefore, since Ingham did not provide the trial court with any evidence that would have allowed them to rule in his favor, his performance fell below that of a reasonably competent practitioner.

The PCR court determined Mablin had established the necessary prejudice:

Beginning with Ingham's failure to investigate, Ingham testified that he did not interview any of the witnesses because he knew how they would testify. Furthermore, he asserted that he did not interview the Campbell family because, even if they were drug dealers, he did not think they would kill a customer. However, the defense counsel is under duty to investigate all mitigating circumstances, and to bring to light credible defense arguments. *See Strickland [v. Washington]*, 466 U.S. [668,] 669 [(1984)].

Ingham's lack of effort in investigating left many facts undeveloped. For instance, Sandra's neighbors reported that they believed she was either selling or using drugs, and multiple neighbors indicated that Sandra was close with the people who lived in or frequently visited Apartment #1. Domer suspected that Sandra was killed by one of the frequent visitors of Apartment #1, Carley Sr. The other people from Apartment #1, Corey and Carley Jr., provided patently false statements to police regarding their actions and whereabouts during the afternoon of Sandra's murder. Therefore, to not depose, or have an investigator interview the witnesses resulted in serious prejudice to [Mablin]. *See* U.S. Const. amend. VI; Iowa Const. art. I, § 10. If Ingham had presented this evidence to the jury, or even slightly developed this evidence, there is a reasonable

probability that the result would have been different as he could have put on a credible defense to the jury. *See Strickland*, 466 U.S. at 695. The prejudice that resulted by failing to investigate a possible defense becomes more evident when considering it in conjunction with Ingham's failure to move to suppress evidence. The overall situation here brings to mind the famous quote from Donald Rumsfeld: "we don't know what we don't know."

Like Ingham's inadequate investigation, the court must also examine if trial counsel's failure to effectively move to suppress resulted in prejudice. As noted above, defense counsel failed to move to suppress [Mablin's] statements or actions from the December 13, 2007 interrogation—despite credible arguments existing regarding custodial interrogation. Consequently, at trial Special Agent George was allowed to testify. His testimony allowed the State to use the multiple different statements that [Mablin] provided to law enforcement regarding Sandra's murder, and his unwillingness to voluntarily surrender his shoes or pants to infer guilt. Suppressing [Mablin's] statements and actions during the December 13, 2007 interview would have had a substantial effect on the trial. Hence, [Mablin] was prejudiced because Ingham did not assert credible suppression arguments regarding the testimony from the December 13, 2007 interrogation.

The other failure to suppress argument concerned the motion to suppress that Ingham did file concerning the December 14, 2007 interview. As stated previously, Ingham did not provide the trial court with the transcript or video recording necessary to make a principle ruling on the motion to suppress. The trial court would have had the opportunity to at least analyze whether there were promises of leniency had Ingham written a more detailed motion, called a witness, provided evidence, provided the transcript, or used the transcript to cross examine the officer. If the trial court found that [Mablin's] confession was induced by a promise of leniency then it would not be admissible. Moreover, the officer's testimony and the pastor's testimony surrounding the December 14, 2007 interrogation would have been suppressed as well. [Mablin] was clearly prejudiced by the lack of effort that Ingham put forth in drafting and arguing his one sentence motion to suppress. Furthermore, there is a reasonable probability that the result would have been different had the trial court been provided with the information that would have allowed them to make a decision.

The PCR court granted Mablin a new trial. The State appeals.

**II. Scope and Standard of Review.**

"Our review of postconviction-relief proceedings is typically for correction of errors at law. But when we are reviewing an ineffective-assistance-of-counsel claim, we do so de novo because such claims are constitutional in nature." *Ruiz v. State*, 912 N.W.2d 435, 439 (Iowa 2018).

**III. Discussion.**

In its ruling on the motion to enlarge, the PCR court made the following specific findings: "That a reasonable probability exists that, but for trial counsel's deficient performance during his representation of Mablin" (1) the trial court would have suppressed evidence or testimony concerning Mablin's alleged December 14, 2007 confession from being used against Mablin at trial on the grounds that the "confession was elicited by the use of promissory leniency"; (2) "the trial court would have suppressed testimony or evidence concerning law enforcement officers' December 13, 2007 custodial interrogation of Mablin . . . on the grounds that said custodial interrogation violated Mablin's rights"; (3) that "trial counsel could have presented a defense case at Mablin's jury trial inculpating the victim's next door neighbors as viable suspects, which defense case would have corroborated Mablin's testimony that he fled the victim's apartment after two men entered the victim's apartment and attacked him"; and (4) "but for trial counsel's deficient performance the result of Mablin's jury trial would have been different." On our de novo review, we are unable to agree with the PCR court's sweeping and unexplained conclusions.

> To succeed on [an] ineffective-assistance-of-counsel claim, [Mablin] must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted. To establish the first prong, [Mablin] must

show [his] counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." We approach the first prong with the presumption counsel performed [their] duties competently; "we measure counsel's performance against the standard of a reasonably competent practitioner." Although not required to predict changes in the law, "counsel must 'exercise reasonable diligence in deciding whether an issue is 'worth raising.'" Counsel is not burdened with the duty to raise an issue that has no merit. The second prong—prejudice—results when "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different."

*State v. Brown*, 930 N.W.2d 840, 855 (Iowa 2019) (internal citations omitted). "The claimant must prove both elements by a preponderance of the evidence." *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012). An applicant's failure to prove either element by a preponderance of the evidence is fatal to a claim of ineffective assistance. *State v. Polly*, 657 N.W.2d 462, 465 (Iowa 2003). We conclude Mablin has failed to prove there is a reasonable probability that the result of the criminal trial would have been different.

Because Mablin has not established his statements about stabbing Chambers-Singh were improperly induced by promises of leniency, we discuss that claim first.

Mablin's PCR application alleges Captain Meier's following statements (emphasis as added by Mablin) during the interview on the evening of December 14 constitute promises of leniency: "Because if you're a man who is sorry, if you're a man who has a heart, *than that's somebody we can work with*," "when you're a sinner, *than I don't want to work with that kind of guy* and I don't want to talk to you"; "But I'm coming to the realization *that I can't work with you* because I don't think . . . I think your heart is cold"; and "*that's not what I want to work with, okay,*

*I don't want to work with somebody who isn't sorry for what they did. I want to work with somebody who is willing to completely bare their soul and say I made the biggest mistake I could."*

At the PCR trial, Mablin testified Captain Meier said something to the effect of "if you wanted to work for me, in order for you to be working for me and I believe for us to be working together that [he] needed to be honest or tell the truth." Mablin stated he believed Meier's "work with" statements during the interview was in reference to his work as a confidential informant. Mablin had previously made an undisclosed number of controlled buys and stated he saw Captain Meier "mainly in the briefing before" one of the buys he performed. But he stated he had "never really seen him after it went through or whatever," and that Captain Meier was only at the briefing "a couple of times." Mablin opined that Captain Meier knew him and knew he was an informant. Mablin testified that on the date of the interview he believed if he told the police what they wanted to hear that he "would get to go home and they would probably let me have a better role as an informant than what I was having at first." Mablin also testified he wanted to give up selling drugs to be a police officer.

In its ruling on the motion to enlarge, the PCR found: "That a reasonable probability exists that, but for trial counsel's deficient performance during his representation of Mablin," the trial court would have suppressed evidence or testimony concerning Mablin's alleged December 14, 2007 confession from being used against Mablin at trial on the grounds that the "confession was elicited by the use of promissory leniency." The PCR court ruling includes this rationale:

> [Attorney] Ingham was in possession of the evidence that was necessary for the trial court to find promises of leniency, yet failed to provide it to the trial court. Thus, without the necessary evidence, the trial court could not determine whether law enforcement officers adopted the pastor's statements that everything would go away if [Mablin] told the truth. Further, the trial court could not properly analyze the context of the officer's statements that referenced working together because Ingham did not inform the trial court that [Mablin] was working for the [police department] as a confidential informant at the time of the interview.

We presume the PCR court is referring to the "working together" statements alleged in the application.

Iowa employs an evidentiary rule of excluding confessions induced by promises of leniency. *State v. Howard*, 825 N.W.2d 32, 40 (Iowa 2012). "The test 'is whether the language used amounts to an inducement which is likely to cause the subject to make a false confession.'" *Id.* (citation omitted). The court has cautioned, "'[T]he law cannot measure the force of the influence used or decide upon its effect on the mind of the prisoner,' and therefore excludes the declaration if *any degree* of influence by force *or other inducement has admittedly been exerted* upon him." *Id.* (citation omitted). In *Howard*, the court found

> Detective Hull's repeated references to getting help *combined with* his overt suggestions that after such treatment Howard could rejoin Jessica and A.E. conveyed the false impression that if Howard admitted to sexually abusing A.E. he merely would be sent to a treatment facility similar to that used to treat drug and alcohol addiction in lieu of further punishment.

*Id. at* 41.

As noted by Mablin, it is an objective test, "The use of a per se exclusionary rule eliminates the need for the court to attempt to read the mind of defendant to determine if his confession, in fact, was induced by or made in reliance upon the promise of leniency." *Madsen*, 813 N.W.2d at 726.

The *Madsen* court outlined how the evidentiary test has been applied in other cases where confessions were found to have been induced by promises of leniency or threats:

> In [*State v.*] *Polk*, we held "the [officer] crossed the line by combining statements that county attorneys 'are much more likely to work with an individual that is cooperating' with suggestions [the defendant] would not see his kids 'for a long time' unless he confessed." 812 N.W.2d [670,] 676 [(Iowa 2012)]. In [*State v.*] *McCoy*, we required a new trial because the defendant confessed after the detective told him twenty-five times that "if he didn't pull the trigger, he wouldn't be in any trouble." 692 N.W.2d [6,] 28 [(Iowa 2005)]. . . . In *State v. Kase*, we reversed a conviction because the defendant confessed after a Division of Criminal Investigation agent told her "that if she told him what she knew about Vaughn's death and signed a consent to search her apartment no criminal charges would be filed against her; otherwise, she was told, she would be charged with murder." 344 N.W.2d 223, 226 (Iowa 1984). In *State v. Hodges*, we held that defendant's confession was inadmissible when he was told "that a lesser charge would be much more likely if he gave 'his side of the story.'" 326 N.W.2d 345, 349 (Iowa 1982). In *Hodges*, we offered some parameters:
>> An officer can ordinarily tell a suspect that it is better to tell the truth. The line between admissibility and exclusion seems to be crossed, however, if the officer also tells the suspect what advantage is to be gained or is likely from making a confession. Ordinarily the officer's statements then become promises or assurances, rendering the suspect's statements involuntary.

813 N.W.2d at 726–27.

The December 14 interview was instigated by Mablin. It began with Captain Meier reading *Miranda* warnings. Mablin was informed, "there's been a crime committed and I'm investigating that crime and I'm investigating your participation in that crime." Mablin asked that the two pastors be allowed to be in the interview with him. Mablin acknowledged to Captain Meier he had twice talked to police and lied "cause I was scared."

While the statements made by Captain Meier about "working with" Mablin are similar to those noted in *Polk* (county attorneys "are much *more likely to work with* an individual that is cooperating"), those statements were not combined with any advantage to be gained, as they were in *Polk* or in *Howard.* The only mention by Captain Meier of an advantage to be gained is this statement, "[W]hen you do that, you're gonna feel a lot better for it." We do not find Captain Meier's statements constituted promises of leniency objectively "likely to cause the subject to make a false confession." *State v. Mullin*, 85 N.W.2d 598, 602 (Iowa 1957).

It is no surprise, then, that Mablin attempts to tie the captain's statements to Pastor Miltenberger's statement, "What did you do with it [the knife] after you took it from her? *We're right there man, and then everything goes away.*" He argues in his brief, "Considering the extent to which [Officers] Meier and Howard allowed [Pastors] Giminez and Miltenberger to participate in [Mablin's] interrogation, the officers' failure to correct or in any way repudiate Miltenberger's statement could be and should be considered an implicit endorsement of the statement." We, however, are unable to conclude that the pastors Mablin brought with him to an interview (an interview he requested) and asked to be allowed to stay with him in the interview were acting as agents of the police. *Cf. State v. Nelson*, 325 N.W.2d 118, 120 (Iowa 1982) (discussing and rejecting claim that a cellmate "assumed the role of a state agent" such that statement made to him were impermissibly obtained in violation of the defendant's right to counsel and thus inadmissible). Even if we would agree with the PCR court that trial counsel could have more effectively prepared for the suppression hearing, because we conclude

a motion to suppress Mablin's statements made during the December 14 interview would not have been successful, Mablin cannot prove he was prejudiced.

We note Mablin's blood was found at the scene of the killing, a man wearing a blue puffy coat was seen leaving the victim's apartment and bleeding as he rode down the elevator, there was blood from the elevator to the victim's apartment door, Mablin admitted knowing Chambers-Singh before he was told she had died, and her van with blood on the driver's door—consistent with a left hand injury—was parked within the vicinity of Mablin's aunt and uncle's residence where Mablin arrived bleeding. Upon his arrival, he asked to wash his clothes. He told varying stories about his injuries to his aunt and uncle, medical personnel, the police, and the pastors of Victory Center.

The PCR court also noted "trial counsel could have presented a defense case at Mablin's jury trial inculpating the victim's next door neighbors as viable suspects, which defense case would have corroborated Mablin's testimony that he fled the victim's apartment after two men entered the victim's apartment and attacked him." The court wrote:

> [Attorney] Ingham testified that he elected not to follow up with Domer because he did not find her credible. Additionally, Ingham knew Dodd was a cocaine dealer, but decided not to question him either. Lastly, Ingham knew Officer Adney worked for the drug task force; yet he did not contact him. If Ingham had reached out to Officer Adney he would have learned that Carley Sr. was Carley Jr.'s father and Corey's uncle. Moreover, he would have learned that Carley Sr. was under investigation for conspiracy to deliver large quantities of crack cocaine, and that his whereabouts during Sandra's murder were unknown.

The Supreme Court has rejected a requirement that an applicant merely show that the errors "impaired the presentation of the defense," finding such

standard "provides no workable principle." *Strickland*, 466 U.S. at 693. "Since any error, if it is indeed an error, 'impairs' the presentation of the defense, the proposed standard is inadequate because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding." *Id.* "Instead, the Court crafted the governing question to be 'whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.'" *Ledezma v. State*, 626 N.W.2d 134, 143-44 (Iowa 2001) (quoting *Strickland*, 466 U.S. at 695)).

The PCR court's ruling is partially grounded on its finding that trial counsel failed to present a "credible defense" concerning Carley Campbell Sr. Mablin points out that Janet Domer informed police that if Chambers-Singh was dead then "either C-Note or Ren killed her." C-Note, aka Carley Campbell Sr., was being investigated for trafficking crack cocaine at the time of Chambers-Singh's death and, several years later, was indicted for a murder elsewhere. But Mablin has not presented any evidence Campbell committed the stabbing of Chambers-Singh. We acknowledge that "[t]he failure to investigate the only reasonable and realistic defense" has been found to render trial counsel's assistance ineffective. *See id.* at 146. But the PCR court's statement that trial counsel is "under the duty to investigate all mitigating circumstances, and to bring to light credible defense arguments" is an overbroad statement.

As to the December 13 interview, we find that even if counsel committed an error, the resulting prejudice on its own does not rise to a level undermining our confidence in the result of Mabin's trial. Based on our review of the record, we conclude the PCR court erred in finding Mablin established the requisite prejudice.

We reverse and remand for dismissal of the application for postconviction relief.
*See Madsen*, 813 N.W.2d at 730.

**REVERSED AND REMANDED.**